J. R. MILLER et ux., appellees, v. J. F. LAWLOR, appellant.

No. 48504.

(Reported in 66 N.W.2d 267)

SEPTEMBER 21, 1954.

Shull & Marshall and Wiley E. Mayne, all of Sioux City, and Loyal Martin, of Cherokee, for appellant.

Cornwall & Cornwall, of Spencer, and Whitney, Whitney & Stern, of Storm Lake, for appellees.

SMITH, J.—Plaintiffs are husband and wife. We shall, for convenience, refer to J. R. Miller as "plaintiff" since Mrs. Miller does not seem to have taken active part in the transaction or trial. They bought their present home in Cherokee, Iowa, from one VanderWal in the spring of 1952. It is on a sightly eminence with what is described as a "terrific" nine-mile view to the south and west across vacant property owned by defendant and to hills and woods beyond.

The part of defendant's premises immediately adjoining plaintiffs' on the south is a rectangular area referred to as the "panhandle", 101½ feet north and south and 175 feet deep. The properties of both parties face east on South Eleventh Street.

Defendant owns a much larger additional tract extending south from the panhandle 257 feet, and west from the street 533 feet. The panhandle slopes downward gently from northeast to southwest. At about its south line the ground drops quite abruptly to the south in a 30 degree incline for 100 to 150 feet, then levels off for a distance and finally descends to the bottom of a ravine.

Plaintiff claims that before he purchased from VanderWal, and in contemplation of such purchase, he obtained oral assurance from defendant that the latter would not build so as to obstruct the view from the house and he bought in reliance thereon.

"I said to Doctor Lawlor that I supposed he had heard I had been dickering on the VanderWal house. He said, 'I hope you purchase the house. We would like to have you as neighbors.' I told him * * * that under no circumstances would I make a bid upon that house if his building plans were in any way to spoil the view to the south and southwest of this home. I told him Mr. VanderWal had told me that he had an agreement with Doctor Lawlor [defendant] as to the location of his [defendant's] house and that I was over there to hear from him as to whether or not he confirmed that agreement. * * * I told him that VanderWal had told me that Doctor Lawlor had agreed that he was building a hillside type of house down at the crest of the hill, and that it would not obstruct any view to the southwest; that the house would be low enough so that we could see over it.

"Doctor Lawlor said, 'that's about right', and he left the room * * * and came back with two sheets of paper with some drawings upon it. * * * He explained the diagrams to me. * * * that his house would be nine feet high * * * would stand * * * approximately seventy feet west of the east lot line. * * * 'There is a rock pile down on the crest of the hill'; that that rock pile would be approximately the northwest corner of his house."

. Plaintiff testifies defendant said VanderWal and he sighted from the living area of the proposed VanderWal house "as to what this would obscure, and that about all it would obscure is the farm buildings down in the valley." I then said to him, "If I purchase this house will you agree that you will not build your house north or west of that location?" and he said " 'certainly.' "

Plaintiff further testifies defendant said "according to his building plans, the north side of his house would be eighty feet south of his north lot line, and that the house would extend from the east lot line approximately seventy feet." Plaintiff later verified the distances. He says "The rock pile was slightly over eighty feet, measured from the fence, which I later learned was about three to four feet south of the true lot line, and approximately seventy-five feet west of the east lot line."

Plaintiff also says he relied on defendant's statement and purchased the premises and would not have purchased without that assurance.

Defendant, while admitting there was a conversation at the time and place referred to, denies he made a statement that he would not build "closer than eighty feet from his lot line" or "farther west than a point seventy feet from my east lot line." "The first time I ever heard these dimensions and measurements* * * was when I was served [May 7, 1953] * * * with the petition in the first lawsuit." (This refers to a suit commenced by plaintiffs but dismissed several days before commencement of the present suit.)

Defendant's wife testifies she was present at the conversation. She is equally limited in her denial: "During that conversation no mention was ever made of a measurement of eighty feet from the north lot line * * *. No mention at all was made by either party of a measurement of distance of seventy feet west from my husband's east lot line."

Neither denies any other part of plaintiff J. R. Miller's testimony. Neither denies the testimony with reference to what defendant was said to have told VanderWal, nor the reference by him in conversation with both plaintiff and VanderWal, to the rock pile as the northwest corner of his proposed home and the proposed height of nine feet of the house at that point. Nor is there any denial that plaintiff in effect secured from defendant a definite agreement with full realization plaintiffs were contemplating purchase of the VanderWal premises on the strength of such agreement.

Mr. VanderWal acquired the present Miller premises in August or September, 1951. He almost immediately thereafter commenced building the house now owned and occupied by plaintiffs. He describes it as "designed for this particular lot so that the housewife would have access to the view no matter what part of the house she was in, with the exception of the bedroom and bathroom. * * * The house was tailored to the lot. * * * A type of construction known as contemporary. * * * It was also designed so that the sunrays in wintertime when the sun was low would reflect on this window wall to make use of the solar heating system. There is about twenty-eight feet of window wall on the south side of the house. * * * There is no frames or anything."

He testifies to a conversation with defendant in the early part of September 1951, "the first day of construction work": "* * * We were just staking out this particular lot and setting up chalk lines where the digging of footings was to be at that time." The witness on that occasion first learned defendant owned the land to the south. They examined the VanderWal plans and the witness says defendant also spoke of his own plans to build "a hillside home of tri-level nature. * * * He pointed out a rock pile" that "would be the approximate west end of the home." They viewed the site where defendant's home might be and concluded it would not obstruct the view from the upper premises.

It was stipulated at the close of VanderWal's testimony that one Ferguson, his building superintendent or construction supervisor, would if present confirm his testimony as to a conversation between Ferguson and defendant in which the latter said his

plans "were of hillside nature" and in which the rock pile was referred to "as the beginning of the north portion of his house and also that, it would not be extended farther west than the rock pile."

There is a definite claim by VanderWal that he obtained assurance at that time from defendant on the strength of which he (VanderWal) went ahead with the construction. He also testifies to later conversations with defendant along the same line. At their first conference, he says, they discussed "sharing the sewer and water", and they later entered into a written "Sewer and Water Agreement", signed and acknowledged before plaintiff's brother and law partner as notary public. That was a month or more before plaintiffs became interested in buying the premises.

We do not go into greater detail of the transactions between VanderWal and defendant as plaintiffs do not seem to have relied on any agreement between those two. The matter is material however as introductory to and explanatory of what plaintiff testifies he said to defendant about it at their conference already mentioned, when the oral agreement between plaintiff and defendant is claimed to have been made. It also tends to corroborate plaintiff's testimony that definite assurance was later given him by defendant.

Plaintiff prays that defendant be enjoined from erecting any structure on his premises closer than 80 feet from his (defendant's) north lot line or extending more than 70 feet west of his east lot line or at a height greater than nine feet above natural ground level at a point 80 feet south of said north lot line and 70 feet west of said east line.

Throughout the trial defendant carefully protected his record by appropriate and careful objections to evidence, urging the statute of frauds and other objections. He also guarded against any possible waiver by careless cross-examination or by introduction of unnecessary evidence. We have no technical problem on that score. We have the clear question as to the sufficiency of the pertinent evidence to show a contract within the exception to the statute of frauds or to establish an equitable estoppel against the ban of the statute. Testimony for that purpose was admissible.

The trial court granted injunction practically as prayed, same to "run with and be binding upon defendant's real estate for the benefit of plaintiffs' real estate and * * * binding upon defendant, his heirs, assigns and any subsequent owners of defendant's real estate", but to terminate "whenever plaintiffs or their successors * * * permanently * * * terminate the use of the view * * *."

The decree allowed defendant a 10% tolerance or leeway on specified distances and height, and protected his right to take advantage of a written waiver tendered by plaintiffs which in effect waived objection to the erection of any "garage or residential structure": (1) Upon the east 40 feet of defendant's premises, regardless of the height thereof; or (2) the extreme north wall of which is 60 feet or more south of defendant's north line and which does not extend more than 100 feet west of defendant's east line and the height elevation of which is six inches lower than the present floor level of plaintiffs' home; or (3) the extreme north wall of which is 60 feet or more south of defendant's north line and regardless of how far west it extends from defendant's east line, providing the portion that is more than 100 feet west of said east line does not exceed a height elevation of six feet below the present floor level of plaintiffs' home.

Defendant has appealed.

I. The trial court's decision is based upon seemingly alternative theories. After a rather thorough discussion of the theory of a contract within the exception to the Statute of Frauds because of claimed "part performance" the court says: "In any event, whether or not plaintiff has brought himself within the recognized exception to the statute of frauds, the doctrine of equitable estoppel entitles him to complete relief." We deem the difference between the two doctrines more apparent than real.

We quote the pertinent part of the statutes from Iowa Code, 1950, section 622.32: "Statute of Frauds. Except when otherwise specially provided, no evidence of the following enumerated contracts is competent, unless it be in writing and signed by the party charged or by his authorized agent: * * *

"3. Those for the creation or transfer of any interest in lands * * *."

Section 622.33: "Exception. The provisions of subsection 3 of section 622.32 do not apply where the purchase money * * * has been received by the vendor, or when the vendee, with the actual or implied consent of the vendor, has taken and held possession of the premises under and by virtue of the contract, *or when there is any other circumstance which, by the law heretofore in force, would have taken the case out of the statute of frauds.*" (Emphasis supplied.)

It will be observed our statute, unlike its English forerunner, does not forbid oral contracts or render them invalid. It relates merely to the manner of proof. Berryhill v. Jones, 35 Iowa 335, 339; McMinimee v. McMinimee, 238 Iowa 1286, 1293, 30 N.W.2d 106. Code section 622.33 permits proof of the oral agreement under the circumstances enumerated.

A consideration of the language of these sections as applied to the record here explains what defendant in argument calls the trial court's lack of faith in the doctrine of part performance. It is particularly difficult to speak in terms of the "creation or transfer of an interest in lands", "purchase money", "vendor", "vendee", and "possession of the premises" under the facts shown. Plaintiffs and defendant were not in the ordinary sense vendees and vendor. There was no "purchase money" to be received by defendant nor any taking of "possession of premises" by plaintiffs. As defendant in argument says, "It is a very strained interpretation" to consider defendant here as a vendor.

Of course the claimed agreement was designed to *create* an interest in land within the purview of the statute. It contemplated the creation of a restrictive or negative easement over defendant's premises in favor of the adjoining premises. 28 C. J. S., Easements, section 3d. That would surely be an "interest." 37 C. J. S., Frauds, Statute of, section 70. Oral evidence of it was inadmissible unless under the statutory exception or unless defendant was estopped to claim the benefit of the statute. Plaintiffs do not claim the contrary.

The acts described in Code section 622.33 as creating the exception, i. e., payment of "purchase money" and taking "possession of the premises", are usually spoken of as "part perform-

ance"; but speaking literally and technically there was here no "part performance." As said in Fairall v. Arnold, 226 Iowa 977, 986, 285 N.W. 664, 669: "The term 'part performance' is a misnomer and inaccurate, in that many matters designated as such are not, in fact, the performance or part performance of the contract, itself, but are those done pursuant to, or in reliance upon, the contract."

The apparent difficulty might perhaps be met as the analogous situation has always been met by the law of contracts, in cases where the promisor derives no benefit but the promisee suffers a detriment. Consideration has always been held to exist in such cases. See citations in West's Iowa Digest, Contracts, Key No. 52. But "consideration" is a broader term than "part performance" and here the statute specifies particular acts of part performance not technically descriptive of those shown in the instant case.

The New York Court of Appeals suggests the doctrine of promissory estoppel has been used in certain cases as the equivalent of consideration. Allegheny College v. National Chautauqua County Bank, 246 N. Y. 369, 159 N.E. 173, 175, 57 A. L. R. 980.

■ We conclude a determination here is unnecessary as to the relative applicability of the doctrine of part performance of contract or the doctrine of estoppel. They need not be distinguished. " 'Promissory estoppel' is now a recognized species of consideration (Restatement of Contracts, §90)." Porter v. Commissioner of Internal Revenue, 2 Cir., 60 F.2d 673, 675. And in Fairall v. Arnold, supra (226 Iowa at page 986) this court quoted with apparent approval from the commentator in 101 A. L. R. 935: "The true basis of the doctrine of part performance, according to the overwhelming weight of authority, lies in the principles of equitable estoppel and fraud." The statement is undoubtedly sound. See also annotation 75 A. L. R. 650.

The trial court, recognizing the close relationship between part performance (as a form of consideration) and promissory estoppel, pointed out that Code section 622.33 not only names specific acts of part performance as creating an exception but also specifies "any other circumstance which, by the law heretofore in force, would have taken the case out of the statute of frauds."

We deem that language sufficient to include what is now called "promissory estoppel." See Vogel v. Shaw, 42 Wyo. 333, 294 P. 687, 75 A. L. R. 639; Wolfe v. Wallingford Bank & Trust Co., 124 Conn. 507, 1 A.2d 146, 149, 117 A. L. R. 932, 936 et seq.

II. The doctrine of equitable estoppel is applicable whenever the representation or promise relied on has been made to induce action or is reasonably calculated to induce action. 31 C. J. S., Estoppel, section 80, page 290 et seq. The Restatement of the Law of Contracts, section 90, says: "A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by the enforcement of the promise." See Fried v. Fisher, 328 Pa. 497, 196 A. 39, 115 A. L. R. 147, and the annotation to that case in 115 A.L.R. 152 et seq. See also Halligan v. Frey, 161 Iowa 185, 141 N.W. 944, 49 L. R. A., N. S., 112.

See also Restatement of the Law of Property, section 524: "An oral promise * * * that certain land will be used in a particular way, though otherwise unenforceable, is enforceable to the extent necessary to protect expenditures made in reasonable reliance [thereon]." "Comment: a. Rationale" immediately following is quite pertinent here but too long to quote.

The authorities make it clear the binding force of the promise does not depend on any personal gain or advantage to the promisor. See Fried v. Fisher, supra, 115 A. L. R. 149, 150, where it is said: "* * * so from the earliest times there was recognized the principle that an estoppel might similarly arise from the making of a promise, even though without consideration, if it was intended that the promise be relied upon and in fact it was relied upon, and a refusal to enforce it would be virtually to sanction the perpetration of fraud or result in other injustice." As stated by an early Michigan opinion: " 'The rule does not rest upon the assumption that he [the party estopped] has obtained any personal gain or advantage, but on the fact that he has induced others to act in such a manner that they will be seriously prejudiced if he is allowed to fail in carrying out what he has encouraged them to expect'." Faxton v. Faxon, 28 Mich. 159, as quoted in 115 A. L. R. (supra) page 159.

1154

■ III. We do not understand defendant questions the naked proposition that equitable estoppel may be effective to take a transaction out of the statute, or more accurately stated, that the statute may not bar oral proof of the promise as a basis for equitable estoppel. He argues however that "plaintiff has failed to prove the following essential elements of estoppel: (1) A clear and definite oral agreement; (2) that plaintiff acted to his detriment *solely* in reliance on said agreement; (3) that plaintiff was without knowledge of the real facts; (4) false representation or concealment of material facts; (5) that a weighing of all the equities entitles plaintiff to the equitable relief of estoppel." It is apparent (3) and (4) are not applicable to promissory estoppel where plaintiff relies on a promise rather than a misrepresentation of fact. There were here no unknown *facts* to be misrepresented or concealed.

We find quite definite (practically undenied) evidence of "a clear and definite oral agreement", relied on by plaintiff to his detriment. The testimony has necessarily been set out in condensed form. Defendant especially urges the indefiniteness of some of the language concerning distances, e.g.: "approximately", "something better than 80 feet", "slightly over", etc. He concedes the definiteness of plaintiff's own testimony in that respect but asserts it was "squarely rebutted both by defendant and defendant's wife."

But, as already pointed out, defendant and his wife merely denied the mention of distances in figures. They did not deny reference to the "rock pile" at the northwest corner of their proposed house nor the measurements by which the location of the "rock pile" was, we think, sufficiently proven. A familiar maxim of law says "that is certain which can be made certain." It applies here. The subsequent ascertainment in distances of the location of the rock pile is not disputed.

Neither defendant nor his wife denied plaintiff said to defendant: "That under no circumstances would I make a bid upon that house if his building plans were in any way to spoil the view to the south and southwest." It was no casual conversation. Defendant must have understood plaintiff was seeking an assurance upon which he could rely and without which he would not act.

There is no evidential denial of plaintiff's testimony that he went to defendant before buying and expressly *stated* the purpose was to learn if VanderWal's report to him was correct and in effect to exact an agreement: "If I purchase this house will you agree that you will not build your house north or west of that location?" (clearly referring to the rock pile).

It must be conceded the lawyerlike way—and plaintiff is a lawyer—would have been for him to have asked for a written contract. But the statutory exception does not exclude lawyers from its benefits when and if they are unwise enough to rely on it. And plaintiff had a right to accept his friend's oral promise in lieu of a written contract.

IV. Defendant's fifth "essential element of estoppel" refers to a "weighing of all the equities." If by that is meant a mathematical comparison of potential disadvantages to the respective parties depending on whether the promise is or is not enforced, the proposition is unsound.

The question is not which party will suffer the greater detriment if the contention of the other prevails. That is not the rule of promissory estoppel—*estoppel that arises when an innocent promisee relies, to his disadvantage, upon a promise intended or reasonably calculated to induce action by him.*

In such case equity is first concerned with the plight of the innocent promisee if the promisor be permitted to seek asylum within the protection of the statute of frauds.

The record here fairly shows plaintiffs bought the VanderWal home on the strength of defendant's commitment as to how he would build. Were he to build as threatened, a real value would be substracted from the plaintiff's premises. The evidence makes it reasonably certain the magnificent view constituted a large part of the inducement for anyone to select such a site for a house. It was clearly the deciding factor without which plaintiffs would not have bought. It was not necessarily the *sole* reliance. It is sufficient that without it plaintiffs would not have acted. 37 C. J. S., Fraud, section 29, page 271, "Test of reliance"; 23 Am. Jur., Fraud and Deceit, section 145.

VanderWal attempted to measure any threatened damage to plaintiffs' home at "from fifty to seventy-five per cent of its

present value." But we agree with him "the damage cannot be evaluated in dollars and cents." That fact merely fortifies the jurisdiction of equity to restrain this threatened wrong. An injury is said to be irreparable where there exists no certain pecuniary standard for measuring the damage. 43 C. J. S., Injunctions, section 23b; 28 Am. Jur., Injunctions, section 48. We think the record shows that here, in the language of the Restatement, "injustice can be avoided only by the enforcement" of the promise upon which plaintiffs relied.

V. While the threatened injustice to the promisee is equity's first consideration, it is proper to consider the possible harshness to defendant by enforcement of his promise.

Much was urged on his behalf during the trial on the necessity, by reason of his profession especially, of easy approach to his garage from the street. That point is probably eliminated by plaintiffs' waiver recognized by the decree which preserves defendant's right under it.

Defendant was preparing to build (in addition to a garage in the northeast part of the panhandle) a house nearly 100 feet long, to be placed diagonally from northwest to southeast on the panhandle (presumably to conform to the slope of the ground from northeast to southwest) set back 27 feet from the street and far enough north to leave room for a terrace between it and the south edge where the ground begins to drop abruptly to the south. This terrace is shown on the architect's plat as 42 feet wide at the house and fanning out wider as it extends some 30 feet to the southern edge of the panhandle.

It is obvious defendant must, under the decree here, abandon that particular plan. But it is not shown impossible to design a home in some other way or of some other type that will be appropriate to and preserve equally well the advantages inherent in the location—possibly such a type as he originally had in mind.

VI. Defendant argues there was between plaintiff and himself a fiduciary or confidential relationship of attorney and client, and that the resulting presumption of fraud has not been rebutted. We find no pleading raising that defensive issue. And we find no suggestion in the record to warn the trial court and opposing counsel that such a contention would be made.

The rule is well established that fraud, when relied on as either a cause of action or as a defense, must ordinarily be pleaded. 37 C. J. S., Fraud, section 78; Goff v. Milliron, 221 Iowa 998, 1003, 266 N.W. 526; Gray v. Earl, 13 Iowa 188; 37 C. J. S., Fraudulent Conveyances, section 363a; 24 Am. Jur., Fraud and Deceit, section 252.

Of course there are exceptions to the rule but we know of none in point here. The fact that plaintiff or his law firm had acted for defendant in other matters, unrelated here, came into the record incidentally. It was not pleaded. The case was not tried on the issue of fraud by violation of confidential relationship or otherwise. There is no indication it was intended by defendant as furnishing the basis for a claim of fraud or undue influence. We cannot find it was ever urged to the trial court and we cannot and should not consider it on appeal.

By disposing of defendant's contention in this way we are not to be understood as implying we find anything in the record to support it had the defense been pleaded. The contrary is true. Any relation of attorney and client in other matters and at some former time (not specified) is not shown to have been such as to have any possible effect in this transaction. Defendant has been plaintiffs' family doctor. "If he had told me that day I had to have my appendix out I wouldn't have doubted it." Plaintiff urges that as an explanation of his failure to ask for a written contract. These relationships make more regrettable this controversy between friends but have no legal significance under this record.

We have tried to give careful consideration to all defendant's contentions. We conclude the trial court reached the correct result and must be affirmed. It is so ordered.—Affirmed.

All JUSTICES concur.