M. GUY HARDIN, SR., appellee, v. THE ESKA COMPANY, INC., appellant.

No. 51305.

(Reported in 127 N.W.2d 595)

372

APRIL 8, 1964.

O'Connor, Thomas, McDermott & Wright, of Dubuque, for appellant.

Clewell, Cooney & Fuerste, of Dubuque, for appellee.

THOMPSON, J.—The controversy in the instant appeal arises from an agency contract by the terms of which the defendant granted the plaintiff exclusive territory in St. Louis and surrounding counties for the sale of a product known as a Port-A-Temp. It was an electrical fan and cooling appliance, in fact a portable air-conditioning apparatus. The plaintiff alleges that after the contract had been entered into and he had expended considerable sums in advertising, employing salesmen, and otherwise, the defendant without notice to him breached the contract by authorizing sales of the product by other parties and by other means in the territory assigned to the plaintiff as exclusive. No claim was made for future profits, but only for the expenses actually incurred prior to the claimed breach by the defendant. The defendant counterclaimed for the price of certain units sold and delivered to the plaintiff. The counterclaim was not denied. The case was tried to the court without a jury, with a resulting judgment for the plaintiff. Judgment was also entered on the counter-

claim. This being considerably less than the amount adjudged due plaintiff, it was offset and a net judgment for the plaintiff in the sum of $4155.80, plus interest of $1120.35, or a total of $5276.15 was entered. So we have this appeal by the defendant.

I. Two errors are assigned. The first is that the trial court erred in finding that the parties entered into a contract as alleged in plaintiff's petition. This requires some elaboration. The defendant admits in its answer that a contract was entered into by the parties substantially as alleged by the plaintiff, under which the plaintiff was given "an exclusive territory in the greater St. Louis area of the State of Missouri, and Illinois, for the direct retail sale to consumers" of the device referred to above. The contract was partly in writing, as shown by letters, and partly oral, through direct and telephone conversations. The defendant may not now be heard to say there was no contract.

It is fair to say, however, that it appears to be defendant's contention that the contract was not binding, because of lack of mutuality and of consideration; and because it provided for exclusive territory only for direct sales, which it contends means door-to-door selling, and so it was free to authorize and make sales in the territory by other methods, such as by ordinary retailing. These raise the major questions in the case.

II. For the purposes of the present case the questions of lack of mutuality and of consideration are substantially the same, and we shall consider them so. It is the defendant's position that the contract as proven did not bind the plaintiff to do anything, and so there was no consideration and no mutuality. The question is ably argued and a multitude of authorities are cited by the contending parties; so many, in fact, that it will be impossible to analyze and discuss all of them without unduly extending this opinion. It is true the contract did not in terms require the plaintiff to do any specific act. But here the fact that he is not claiming future profits, but only expenses actually incurred, becomes important. Many of the cases cited by the defendant involve claims for future profits, under similar contracts. Here the fact that the contract is not for a definite time, but may be canceled by either party, generally held by the cases to be on reasonable notice and that it does not require the

agent to sell or to purchase any certain number of the product, or to do any specific act, seems to be often, although not always, a bar to recovery of future earnings or profits. But we do not have that problem here.

The plaintiff contends that when he was given an exclusive territory, it was contemplated that he would act upon the promise, and in so doing would incur certain expenses and make certain efforts. In fact, sales are made in that way. Not often is there such a sellers' market that no effort or expense is required.

In Miller v. Lawlor, 245 Iowa 1144, 1153, 66 N.W.2d 267, 273, 48 A. L. R.2d 1058, we quoted with approval from Restatement of the Law of Contracts, section 90: "A promise which the promisor should reasonably expect to induce action or forbearance * * * is binding if injustice can be avoided only by the enforcement of the promise." Here, the promisor, the defendant-company, must have expected its assignment of exclusive territory would "induce action" by the plaintiff.

In Atlas Brewing Co. v. Huffman, 217 Iowa 1217, 1221, 1222, 252 N.W. 133, 135, we said: "The contract provided, as claimed by appellee, that it was to continue as long as there would be a demand for the product, and as long as appellee desired to continue with the sale of the same. And such contracts have been held valid in practically all jurisdictions, until, at least, a reasonable notice of cancellation is given." See also Lee & Son Co. v. Sundberg, 227 Iowa 1375, 1381, 291 N.W. 146, 149; Burghardt v. Scioto Sign Co., 191 Iowa 384, 388, 179 N.W. 77, 79; Hichhorn, Mack & Co. v. Bradley, 117 Iowa 130, 138, 90 N.W. 592, 594; and Whorral v. Drewrys Limited U. S. A., Inc., 214 F. Supp. 269. Many other authorities might be cited.

The defendant cites E. I. Du Pont de Nemours & Co. v. Claiborne-Reno Co., 8th Cir., 64 F.2d 224, 89 A. L. R. 238, in support of its contention that the contract is unenforceable because of its lack of mutuality and consideration. But the question there was the right of the Du Pont Company to cancel an agency contract so as to eliminate the agent's future profits. The case holds that under the language of the agreement the agency might be canceled at anytime. We have no such problem here. The right of the defendant to cancel the contract, at least after reasonable

notice, is not in dispute. Language in the Du Pont case in fact upholds plaintiff's position. There is quoted with approval from Miami Coca-Cola Bottling Co. v. Orange Crush Co., 5th Cir., 296 F. 693, 694: "It may be conceded that the appellee is liable to the appellant for damages for the period during which the contract was performed; but for such damages the appellant has an adequate remedy at law."

■ This covers the situation before us. We have here, in fact, a promise for an act, an act for a promise; and when the act required by the promise has been performed, it is compensable. Cases such as Lewis v. Minnesota Mutual Life Ins. Co., 240 Iowa 1249, 37 N.W.2d 316, where the controversy centered around future profits, are not in point. Future profits may well be denied when the promisee is not bound to do anything; but when the promise contemplates that the promisee will do certain things and these things have been done, justice and authority both require that compensation be made.

■ III. The second assigned error asserts there was insufficient basis for the trial court's holding there was a breach of the contract by the defendant. The defendant's first argument here is that the plaintiff himself did not perform his part of the contract, because he did not order substantial numbers of the product. While there is no specific language in the contract as proven that called for any particular numbers of the devices to be purchased by the plaintiff, the defendant asserts such an agreement is implied, since the purpose of the parties in making it was to market them. We may concede this, and also that a failure of one party to perform a contract releases the other from compliance. Defendant's difficulty at this point is factual. It appears without question that the device to be sold was seasonal. It was a summertime product, and sales in winter or early spring would necessarily be limited. The plaintiff had been busy with his corps of salesmen securing orders, and had notified the defendant that he had approximately 500 on hand, for delivery when weather conditions made the use of the Port-A-Temp desirable. Both parties knew the device was seasonal; and we think, conceding it was an implied condition of the contract that the plaintiff should order a substantial number of them, it was at

least within the proper province of the trier of facts to find that these orders were not reasonably to be expected until the beginning of the summer season. A few very thrifty people buy their straw hats in the wintertime, but these are not many. See Whorral v. Drewrys Limited U. S. A., Inc., supra, loc. cit. 214 F. Supp. 271.

The breach of which the plaintiff complains took place in March of 1957. At this time the defendant agreed to and did sell to Mid-America Distributors a number of the devices for resale in the territory assigned to the plaintiff. Mid-America, in turn, sold to Glaser Drug Stores, a chain company with several stores in the St. Louis territory. This concern then advertised widely on April 10 that it had the Port-A-Temps for sale at $19.95. The price at which the defendant had advertised the product in national magazines was $59.95, and that was the price at which the plaintiff was attempting to sell them, and at which his organization had taken many orders. The record shows this price fixed by the plaintiff was known to the defendant.

The result of the sale to Glaser Drug and its advertisement at the cut-rate price was of course catastrophic to the plaintiff and his salesmen. About one half of the salesmen did not appear the next morning after the advertisement of the $19.95 price appeared. A large majority of the customers who had signed orders refused to complete the transactions, and demanded their deposits back. Future sales were impossible, and those already made were mostly canceled. The time and expense devoted to the project by the plaintiff were lost to him, and his action asks recompense.

Mr. Eldon F. Essman, who had been a vice-president of the defendant-company during the times material here, and with whom the plaintiff had dealt in making his agency contract, testified as a witness that the offering of the units for sale in retail outlets with advertising such as the Glaser Company put out would substantially hamper any direct selling campaign by the plaintiff. He said he was unhappy with the number of units the plaintiff had ordered. We have discussed this point above.

It further appears from defendant's answer and the testimony of L. D. Kascel, president of defendant-company, that

plaintiff's contract was for exclusive territory only as to door-to-door selling. Direct selling, it is urged, means door-to-door, in the understanding of the trade. For the purpose of this discussion we may concede this interpretation. Mr. Kascel, in his testimony, said: "I saw no reason to protect Mr. Hardin. This was another type of selling." In other words, although Hardin had exclusive territory for door-to-door selling, the defendant concluded it might send the units into the territory for sale by retail without breaching its contract. This, although its officers knew such a procedure would seriously damage any chance of sales by the plaintiff. They say they were dissatisfied with the volume of orders produced by the plaintiff, and felt no consideration was due him. They did not know the price at which the retailers would offer the product; but they put no restriction on it.

The record shows that at the time of entering into the contract with Mid-America, the question of the plaintiff's rights was discussed. But it was stated that, since he had not made a satisfactory volume of purchases, he was entitled to no consideration; that, indeed, he could go to a specified location—a spot, in fact, a good deal warmer than St. Louis. While by common repute this place would in some respects seem to be an ideal territory for the vending of cooling devices, there are no doubt practical difficulties in the way of setting up a sales organization. At any rate, the plaintiff elected to go to court instead.

What the defendant is saying here is that it could destroy the possibility of substantial sales by the plaintiff in the exclusive territory awarded him by his contract, by the device of permitting sales in a different manner from that provided in the agreement with plaintiff. The distinction is too narrow. For two reasons we think there was substantial evidence of a breach of the contract by the defendant to warrant a finding thereof by the trial court. First, the rule is well settled that one party to a contract may not hamper the efforts of the other in performance according to its terms. We quote from 17A C. J. S., Contracts, section 468, page 641: "Each party to a contract impliedly agrees not to prevent * * * the other party from performing, or * * * to render performance impossible by any act of

his own. Furthermore, a promise to perform a particular act implies a promise not to perform an inconsistent act."

We have applied the rule. In Kaltoft v. Nielsen, 252 Iowa 249, 258, 106 N.W. 597, 602, are these words: "We also recognize the rule that in all contracts there is an implied term that the person for whom the work is contracted to be done will not obstruct, hinder or delay the contractor, but, on the contrary, will in all ways facilitate the performance of the work to be done by him."

Many cases from other jurisdictions are to the same effect. Among these is Buckley & Scott Utilities v. Petroleum Heat & Power Co., 313 Mass. 498, 503, 48 N.E.2d 154, 157, which contains especially cogent language upon the point here considered: "Moreover, even in the absence of an express agreement, there would have been implied in the franchise an agreement on the part of the 'Owner' not to engage in competition with the 'Dealer' in the latter's exclusive territory by means and in a manner that would practically destroy the right granted and that would also render it impossible for the 'Dealer' to 'promote' sales and to 'operate his entire territory' as the terms of the franchise required it to do."

In the second place we also think the circumstances surrounding the making of the contract show clearly the defendant had determined to sell by "direct sales" and its agreement with the plaintiff which gave him exclusive territory therefor was in fact exclusive of all other methods of selling, so long as he performed on his part. Mr. Essman testified that in the latter part of 1956 the defendant "changed its general method of merchandising the Port-A-Temp and we decided to go on direct sales. This means that the Port-A-Temp was not sold through legitimate channels such as department stores, chain stores, etc. Mr. Kascel and myself made this decision. We placed an ad in Salesmen's Opportunity * * *." This was apparently the ad which the plaintiff saw and which led to his contract with the defendant. The advertisement, identified by the plaintiff, contains these statements:

"Here is the most exciting announcement to hit the direct selling field in 25 years! * * * It doesn't make any difference

what you sell direct * * * the new Port-A-Temp is a direct selling natural 'plus' profitmaker * * * Instead of pouring $2½ million into expensive advertising we've decided to reduce our costs—and at the same time making it possible for YOU to make the big profit. We want the man who makes the calls to make the profit."

The gist of this is that the defendant-company had decided to sell by direct selling—door-to-door calls—to adopt the contention that that is the meaning of "direct selling"—and anyone who answered the advertisement and contracted with the company had a right to take it at its word. Impliedly at least, it promised to sell in that manner only; it had decided to make it possible for the door-to-door salesman to make the "big profit."

Obviously there was no "big profit", or any profit, if the territory in which the salesman was to operate was flooded with offers of the product by a chain store concern at the cut rates quoted by Glaser Drug. Any chance for the plaintiff to sell was destroyed by the defendant, and the trial court's decision that it breached its contract is strongly supported by the record.

IV. Finally the defendant urges that the sales to Mid-America Distributors were to a wholesale organization not dealing in direct retail sales to customers; that Mid-America Distributors were a wholesale organization only. That the sales and shipments to Mid-America were for resale in the St. Louis area is not denied. No limitation was placed on the manner in which the product would be handled by Mid-America. It was free to sell to retailers, such as department stores, chain stores, or to any other purchasers. If it sold to persons for direct sales, there was a violation of the express terms of the contract with the plaintiff; if to retail outlets, a violation of the implied terms as we have pointed out in Division III above.

We find no error.—Affirmed.

All JUSTICES concur.