In the Matter of the ESTATE of J. Wesley GRAHAM, Deceased.

ESTATE of Leonard L. GRAHAM, Deceased, Henrietta S. Graham, Executor of the Estate of Leonard L. Graham, and Henrietta S. Graham, Individually, Appellants,

v.

Mary Elizabeth FERGUS, Individually and as Trustee for Christian Home for Children and Salvation Army and as Executor for the Estate of J. Wesley Graham; George Robert Graham, Individually and as Trustee for Christian Home for Children and Salvation Army and as Executor for the Estate of J. Wesley Graham and as Executor for the Estate of Earl R. Graham; Iowa-Des Moines National Bank, as trustee for Christian Home for Children and Salvation Army and as Executor for the Estate of J. Wesley Graham; Marjorie Graham Johannes, Cornell College, Methodist Church, Ida Grove, Iowa, Christian Home for Children, Salvation Army, Estate of J. Wesley Graham, Deceased, and Estate of Earl R. Graham, Deceased, Appellees.

No. 63693.

Supreme Court of Iowa.

Aug. 27, 1980.

Richard F. Branco of Branco, Boerner & Renegar, Ida Grove, for appellants.

Edgar C. Musgrave and David L. Phipps of Whitfield, Musgrave, Selvy, Kelly & Eddy, Des Moines, for appellee Salvation Army.

Richard W. Peterson, Council Bluffs, for appellee Christian Home for Children.

Considered by LeGRAND, P. J., and UH-LENHOPP, HARRIS, McCORMICK and LARSON, JJ.

LARSON, Justice.

This litigation involves the estate of J. Wesley Graham, who died December 21, 1976. The plaintiffs, who were the estate of Leonard Graham, a brother who died on April 17, 1977, and Henrietta Graham, Leonard's widow, sought to have the entire will set aside. In the alternative, they sought to have it nullified as to a farm known as the "home place." Plaintiffs also submitted a claim for personal services rendered on behalf of Wesley Graham. The petition alleged: (1) that the will was not properly executed; (2) that it was the result of a mistake either by the testator or the draftsman; (3) that a 1920 conversation created an enforceable contract to divide the property among Wesley, Leonard and their father; (4) that subsequent representations made by Wesley to Leonard are enforceable against his estate under a theory of promissory estoppel; and (5) that Leonard and Henrietta were entitled to recover from Wesley's estate the value of food and services provided while he resided with them for approximately twenty-five years. On cross-motions for summary judgment, the trial court granted the defendants judgment on all divisions. We affirm the trial court.

Wesley died a wealthy man. The preliminary inheritance tax report estimated the value of his estate at $6,688,504.61, including nearly 2800 acres of farmland. However, the nub of this controversy is Wesley's testamentary disposition of his interest in the "home place," a 320-acre farm in Ida County which Wesley and Leonard held as tenants in common at the time of Wesley's death. One plaintiffs' witness had overheard a 1920 "barnyard conversation" among Wesley, Leonard and their father. The discussion was sparked by someone asking if the father intended to sell the farm. He replied that he had no such intention because he wanted it to remain in the family. He indicated he would give it to Wesley and Leonard and wished that if either one of them died without children, the survivor would receive that brother's share. At that point one of the boys said, "You know what you want," or "If that's your wish, father." The witness "wouldn't recall that was Wes," but thought that it had been because "he generally was the spokesman when the two were together."

According to the plaintiffs, Wesley had reaffirmed to Leonard that it remained his intention to fulfill his father's wish that the farm would stay in the family. Henrietta

testified in her deposition about a conversation she overheard between Wesley and Leonard on November 7, 1976. Leonard asked at that time, "You've said all through the years that the farm will stay in the family. And is that still your thinking?" Wesley replied, "Yes, it is." However, Wesley's testamentary disposition did not implement that plan. Instead, the home place went into the J. Wesley Graham Trust, as did nearly the entire estate. Plaintiffs contend Wesley was bound to give effect to the prior understandings of the brothers and to devise the home place to Mary Fergus, Leonard's daughter and the only child of either of the brothers.

Iowa R.Civ.P. 237(c) provides that "judgment . . . shall be [entered] . . . if . . . there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." The absence of a genuine issue of material fact is not established by the absence of a dispute over the facts; rather, if reasonable minds could draw different inferences from undisputed facts, such an issue remains, and summary judgment is inappropriate. *Brody v. Ruby*, 267 N.W.2d 902, 904 (Iowa 1978). In the case presently before us, neither the facts nor the inferences to be drawn from them are in dispute. The battle is waged over the legal consequences which flow from these undisputed facts. Under such circumstances, summary judgment is appropriate. *Eastern Iowa Cablevision, Inc. v. City of Iowa City*, 272 N.W.2d 413, 416 (Iowa 1978). Plaintiffs have conceded in discovery that no available witnesses, other than those whose testimony was furnished, had knowledge of the facts relevant to the issues raised in this appeal.

I. *Due execution.* The alleged deficiencies in the execution of the will involve (1) the declaration of the testator that the instrument was his will; and (2) his request that it be signed by the witnesses. *See* § 633.279, The Code 1973. The facts surrounding the execution of the will are undisputed and come from the deposition of Herschel Langdon, the attorney who drew it. Asked to recall what words were used

in making the declaration, he responded, "I usually put it in the form of a question, and I'm sure that's what I did. I asked him, 'Is this your Last Will and Testament and is this the way you want it?' And he said, 'Yes.'" Langdon indicated that Wesley requested the persons to witness the will by coming into the office and saying, "I want to execute my Will." As to whether the testator had requested the witnesses to act, the attorney testified that Graham came into the office and said, "I want to execute my Will" but did not specifically request their signatures during execution "because we had done them before for him, and he knew what we were—he knew we were going to be the witnesses. When I called [the other witness] in I told him I was going to call her in so she could be a witness." Langdon testified further that before Wesley executed the will, it was reread and he reaffirmed its correctness; after this reaffirmation the attorney said, "Well, if that's true we will get the witness in here and execute this." In addition to this testimony, the first paragraph of the will itself, stated:

I, J. Wesley Graham, of the County of Ida, State of Iowa, make, publish and declare this instrument to be my last Will and Testament and revoke all former wills and codicils executed by me.

Also, the attestation clause stated that the will was "[s]igned, sealed, published and declared by the said J. WESLEY GRAHAM as and for his last will and testament . . . . ."

Plaintiffs contend that these facts do not meet the requirements of section 633.279, The Code 1973, which provided in relevant part:

All wills and codicils . . . to be valid, must be in writing, signed by the testator, or by some person in his presence and by his express direction writing his name thereto, <u>and declared by the testator to be his will</u>, and witnessed, <u>at his request</u>, by two competent persons <u>who signed as witnesses in the presence of the testator and in the presence of each other</u> . . . . [Emphasis added.]

The underlined provisions are the basis of this challenge. Plaintiffs argue that the addition of these requirements to the former execution statute show a concern which necessitates strict compliance with them.

The "declaration" requirement was apparently added to countermand decisions of this court which observed that there was no such requirement under the former statute. *See, e. g., In re Estate of Bybee*, 179 Iowa 1089, 1093, 160 N.W. 900, 901 (1917). The analysis in *Bybee* was that "[i]t is of no consequence what she thought was the legal effect of [the paper she signed]. The law settles its status and declares what it is." *Id.* Thus, it would appear that the purpose of adding the requirement was merely to ensure that the testator realize the testamentary significance of his actions. This purpose is satisfied here in view of the client-lawyer colloquy, as accompanied by the wording of the will. We hold that under the circumstances of the case, compliance with the statute was shown, and that the testator did declare the instrument to be his will.

■ The purpose in adding the requirement that a testator "request" the witnesses to act is unclear because, although it was not an express statutory requirement, such a request was an established requirement under the case law. *See, e. g., In re Estate of Hagemeier*, 244 Iowa 703, 706, 58 N.W.2d 1, 3 (1953). Under those cases, such a request "may be implied from the acts of the testator or from the surrounding circumstances." *Id.* Plaintiffs argue the amendment must be interpreted to require an express request by the testator, thus abrogating our case law that the request could be implied. They argue that any other interpretation would render this amendment meaningless. We disagree. "[T]he mere fact that the legislature enacts an amendment indicates that it thereby intended to change the *original act* . . ." 1A A. Sutherland, *Statutes and Statutory Construction* § 22.30 (C. Sands ed. 1972) (emphasis added). However, "amendatory acts do not change existing law further than is expressly declared or necessarily

implied," and "the common law will not be deemed changed, unless the language making the alleged change is clear and unambiguous . . . ." *Id.* The circumstances surrounding this amendment indicate nothing more than the legislature considered it advisable to codify the request requirement. Codification alone is sufficient motivation for the amendment due to the dynamic nature of the common law, and there is nothing in the language of the amendment which evidences a desire to change our common-law rule regarding what constitutes such a "request." We reaffirm the *Hagemeier* rule that the request may be implied from the testator's acts or the surrounding circumstances, and hold that the request requirement was met in this case by the circumstances of the execution.

■ II. *Mistake.* This ground for contesting the will is based on *In re Estate of Kempthorne*, 188 Iowa 70, 175 N.W. 857 (1920). In *Kempthorne*, the draftsman of the will set up a trust for a daughter of the testator under the erroneous impression that she was still married, in order to prevent the possibility of her husband's acquiring an interest in her share of the estate. However, she was divorced at the time the will was executed. The court, in holding that the will should not have been admitted to probate, noted that "the clause in question was included through [the draftsman's] mistake of fact as to the existence of a divorce." *Id.* The court concluded the establishment of the trust was not the intent of the testator and that the trust should not be given effect. This is distinguishable from the present case. Failure of a testator to relate other alternative plans for disposition of his property does not amount to a mistake of fact.

On the other hand, the evidence offered in support of defendants' motion for summary judgment reveals Wesley consulted with his attorney several times about the provisions of the will and approved them twice before he executed it. Additionally, Wesley explained to his lawyer why he was making no provision for Leonard and little

provision for other relatives. We believe the trial court was correct in determining that

> The last will and testament of J. Wesley Graham was a well reasoned and intentionally prepared document intended to carry out a specific plan which originated in the testator's mind and was meticulously followed in the terms of the document itself. There are no facts shown which would raise a genuine issue as to the will or any provisions thereof being a result of a mistake on behalf of the testator or on behalf of the draftsman of the will.

■ III. *Contract.* The plaintiffs allege that the 1920 "barnyard conversation" resulted in an oral contract by Wesley, Leonard and their father, which provided that if one of the brothers died without children, he would will his undivided one-half interest in the farm to the survivor. Summary judgment was granted with regard to this division on several grounds, one of which was that "there [was] not . . . such a showing of any existing and enforceable contract as to justify specific performance of the same." Where reasonable minds could not draw different inferences from undisputed facts, there is no genuine issue of material fact and resolution of the case becomes a question of law. *Sand Seed Service, Inc. v. Peockes,* 249 N.W.2d 663, 666 (Iowa 1977). No reasonable factfinder could conclude that the 1920 conversation resulted in an enforceable contract. "It is the agreement to, and mutual understanding of, the existence of an obligation assumed by one of the parties to the other, that . . . is the essential element of a contract." *In re Estate of Newsen,* 206 Iowa 514, 518, 219 N.W. 305, 307 (1928); *see LaFontaine v. Developers & Builders, Inc.,* 261 Iowa 1177, 1183, 156 N.W.2d 651, 655 (1968); *In re Estate of Lindsey,* 254 Iowa 699, 708, 118 N.W.2d 598, 604 (1963). The evidence showed an isolated instance of the father's ruminations about the future of the farm and an acknowledgment by one of the sons that he understood the father's wishes. We do not believe a rational factfinder could determine that any of the parties

intended to be bound by the conversation. The only living witness to this conversation was Chester Phelps, whose deposition testimony was offered in support of the plaintiffs' claim. He testified that in 1920, the father said he would not sell the home farm because he wanted it to remain "in the Graham name," and he "wanted the boys— his sons, those two sons that were there, to have the place." In response to the question, "Did the boys have any comment to him about what they intended to do [with the farm] when they were gone?" this witness said, "Well, they seemed to agree with him that that's what would happen. They didn't specifically say that probably. I think maybe Wes said, 'that's your wish' or something."

Taken at its face value, this equivocal testimony merely establishes that one of the brothers acknowledged the father's wishes. The witness could not say with certainty that Wesley made that statement; he presumed that to be the fact because Wesley usually was the spokesman when the two brothers were together. From this evidence, no reasonable factfinder could conclude that Wesley entered into a contract. The trial court properly entered summary judgment on the contract issue.

■ IV. *Promissory estoppel.* This division of the petition asserts Wesley's representations that he would follow the father's wishes are binding under the theory of promissory estoppel because Leonard relied upon them to his detriment. The elements of promissory estoppel are (1) a clear and definite agreement, (2) proof that the party seeking to enforce the agreement reasonably relied upon it to his detriment, and (3) a finding that the equities support enforcement of the agreement. *Merrifield v. Troutner,* 269 N.W.2d 136, 137 (Iowa 1978); *Johnson v. Pattison,* 185 N.W.2d 790, 795 (Iowa 1971); *Shell Oil Co. v. Kelinson,* 158 N.W.2d 724, 729 (Iowa 1968); *see Meylor v. Brown,* 281 N.W.2d 632, 635 (Iowa 1979). This doctrine is essentially based upon the Restatement of Contracts § 90 (1932): "A promise which the promisor should reason-

ably expect to induce action or forebearance of a definite and substantial character on the part of the promisee and which does induce such action or forebearance is binding if injustice can be avoided only by enforcement of the promise."

This concept binds the promissor to a gratuitous promise where, "in reliance upon the promise, the promisee had suffered a substantial loss, expended money or incurred liability, that he would not have suffered, expended or incurred except for the promise." O. Patton, *Iowa Annotation to the Restatement of Contracts* § 90, at 179 (1934) (quoting 4 A.L.I. Proceedings 101 (1926)).

▮ Because we have determined that no evidence showed the parties intended to be bound by the 1920 conversation, there is a serious question whether the first element of promissory estoppel has been satisfied. Assuming the existence of some sort of agreement on the strength of Henrietta's deposition testimony, that testimony does not establish the agreement was either "clear" or "definite" as to Wesley, Leonard and their father. No other evidence was presented which lends support to plaintiffs' claim of any agreement.

Second, plaintiffs' evidence demonstrates no detrimental reliance on the agreement by Leonard. The acts plaintiffs assert were made in reliance on Wesley's representations are Leonard's (1) forebearance from selling his interest, (2) making improvements on the land, (3) forebearance from attempting to buy Wesley's interest and (4) "keeping his end of the bargain" by devising his interest to his daughter. According to Henrietta's testimony, however, Leonard did not expend any money for the purported agreement, and all improvements to the home place were made by the brothers jointly. In addition, there has been no showing by the plaintiffs that Leonard ever contemplated the sale of his interest to Wesley or the purchase by him of Wesley's share, or that Leonard acted to his detriment in devising his interest in the land to his own daughter. In sum, there is no genuine issue of fact upon which to estab-

lish a foreseeable, reasonable, substantial, and prejudicial reliance by Leonard on the "agreement." *See* 1A Corbin, *Contracts* § 200, at 215–18 (1963).

Third, there are no equitable considerations requiring or warranting enforcement of the purported agreement. Accordingly, *Miller v. Lawlor*, 245 Iowa 1144, 66 N.W.2d 267 (1954), is inapposite as support for plaintiffs' contention that the weighing of the equities rests in their favor. There has been no showing of an irreparable injury occasioned by Leonard in relying upon the alleged agreement such that "injustice can be avoided only by [its] enforcement." *Id.* at 1156, 66 N.W.2d at 274.

▮ V. *Food and services.* The plaintiffs' claim for food and services is based on acts preceding 1967. Therefore, summary judgment was granted on the ground that the claim was barred by the statute of limitations. The plaintiffs do not deny that the period of limitation had passed; however, they argue that the estate cannot assert the bar of the statute under the doctrine of fraudulent concealment. That doctrine is succinctly stated in *Pride v. Peterson*, 173 N.W.2d 549, 555 (Iowa 1970) (citations omitted):

> [M]ere ignorance [of the cause of action] is not enough. Plaintiff must allege and prove facts showing (1) that the party against whom the cause of action exists did some affirmative act to conceal the cause of action, and (2) that plaintiff exercised diligence to discover the cause of action. . . .
>
> An exception exists, however, where a confidential or a fiduciary relationship is present. There the requirement of affirmative acts of concealment be alleged and proven is supplied by mere silence and diligence in discovering the fraud complained of is, likewise, greatly relaxed.

There is no showing here of either an affirmative act to conceal the cause of action or the existence of a fiduciary relationship which would obviate that showing. The plaintiffs' attempt to avoid the statute of

limitations is therefore insufficient as a matter of law. Summary judgment was accordingly proper.

We find no error in the trial court's ruling and therefore affirm.

AFFIRMED.