—————

No. 95-2958
—————

Simmons Poultry Farms, Inc.,       *
                                   *
            Appellant              *
                                   *    Appeal From the United
    v.                             *    States District Court for the
                                   *    Southern District of Iowa
Dayton Road Development Company *
d/b/a Carriage House Meat and      *
Provision Company, Inc.,           *
                                   *
            Appellee.              *


—————

        Submitted:  January 10, 1996

        Filed:  April 25, 1996
—————

Before RICHARD S. ARNOLD, Chief Judge, BOWMAN, Circuit Judge, and JONES,*
Senior District Judge.


JONES, Senior District Judge.


    Dayton Roads Development Company d/b/a Carriage House Meat and
Provision Company, Inc. ("Carriage House") brought this action against
Simmons Poultry Farms, Inc. ("Simmons") on a turkey processing venture.
The case was tried to a jury on the theories of breach of contract and
promissory estoppel.  The jury returned a verdict in favor of Carriage
House in the amount of $96,794.00 on the promissory estoppel claim.  The
District Court denied Simmons' post-trial motion for judgment as a matter
of law and Simmons now appeals that decision.  We reverse.

---

*The HONORABLE JOHN B. JONES, Senior District Judge, United
States District Court for the District of South Dakota, sitting by
designation.

## I.  Factual Background

In the summer of 1990 representatives from Carriage House and Hubbard Foods, Inc. ("Hubbard") began discussing a business venture to process turkey into cutlets, tenders, chops and cold cuts (hereinafter called "the project").  Hubbard was to supply the raw meat and market the end products while Carriage House was to process and package the turkey for a fee. Prior to an agreement being reached on this venture, Simmons bought out Hubbard in September of 1990 and continued the negotiations on this venture with Carriage House.

The principal individuals involved in the negotiations were Mr. Ron Ketcham, President of Hubbard; Mr. Jeff Lea, Hubbard's sales manager; Mr. Marvin Walter, Chairman of the Board of Directors of Carriage House; and Mr. Joe Cooper, Director and Plant Manager of Carriage House.  Following the buy-out of Hubbard by Simmons, Ketcham continued as an employee for 90 days and was then replaced by general manager Mr. Mike Morris in November of 1990.  Lea also remained as a transitional employee and was principally in charge of marketing the project.  Mr. Craig Ford investigated the types of equipment needed and researched the market for the project while serving as a consultant on the project and being compensated by both Carriage House and Simmons.

The negotiations were conducted both orally and in writing.  Walter testified that although he personally participated in some of the conversations with Simmons, Cooper as the plant manager was principally in charge of the project.  On September 14, 1990, Cooper wrote to Ketcham stating that Carriage House was definitely interested in going forward with the project.  The letter informed Ketcham the cost of the equipment for the project to be purchased by Carriage House would be approximately $350,000. Cooper further explained that Carriage House would need a minimum of 2.6 million pounds of product per year, consisting of 20,000 to 30,000 pounds

for the first ten weeks of production and 50,000 pounds per week thereafter.  Ketcham did not respond in writing to this letter.

Cooper wrote a memorandum to Walter on November 6, 1990 to report the results of a meeting held on November 2, 1990 between Cooper, Ketcham and Lea.[1]  Walter incorporated this memorandum into

---

[1]  The memorandum provides as follows:
November 6, 1990

TO:     Marvin J. Walter
FROM:   Joe Cooper
RE:     Meeting with Hubbard/Simmons co.
        Ron ketcham and Jeff Lee
        Friday, November 2, 1990

Ron Ketchem was extremely positive about going forward with the turkey project with modified atmosphere equipment with outside co-packer such as Carriage House.

They would guarantee an arrangement for at least one year with a 90 day notice of termination.

Hubbard/Simmons would like to get started immediately with the possibility of having product to test market Jan. 1, 1991.

They are very positive about this project leading into other items which would lend itself to a stronger and more feasible relationship between Carriage House and Hubbard/Simmons.

On the downside, Hubbard/Simmons would probably agree to take over the modified atmosphere packaging equipment if there actually was a termination after 15 months.

Ron K. felt the Jewell facility was totally adequate for start up and was quite impressed that it was ready daily to produce in.  He did indicate that he would be surprised with start up that we, Carriage House and Hubbard/Simmons, would not outgrow the present facility very quickly.

Ron K. showed some concern that the Carriage House-Hubbard/Simmons project would be carrying the entire overhead and indicated he would have no problem with Carriage House co-packing with the same equipment to customers outside Hubbard/Simmons basic upper midwest marketing area.  Also that we could start up immediately processing and marketing the

3

a letter he wrote to Ketcham on November 12, 1990 informing Ketcham that Carriage House was ready to proceed with the project.[2]

---

food service items through Hubbard/Simmons and/or on our own.

Ron K. did indicate there would be no guarantee on tonnage by the quarter, and that if they were to commit, it would be less than our suggested 50,000 lbs/week. However, at the same time he indicated they are conservative and it could be more.

[2] The letter provides as follows:

Dear Ron:

In line with your recent visit to Ames and the discussions you held with Joe Cooper that were confirmed in Joe's attached memo to me, we are now ready to move ahead on the project. Although I personally feel a relationship of this nature should be based on a formal contract with minimal guarantees, we are nevertheless going to purchase the necessary equipment and proceed to prepare for production.

We currently anticipate we will be ready to produce retail product in a modified gas flushed package around January 1, 1991. We expect to start producing the various institutionally packed items as soon as we receive appropriate labeling and packaging information from you.

At this time, we will plan to produce and sell under the Carriage House corporate arrangement and will not be forming a new corporation to handle this business.

Bill Staley will be working under the direction of Joe Cooper at our Jewell, Iowa plant. Craig Ford will be assisting us on this project but will not be part of our permanent management team. The length of his involvement and the degree we will employ him in this project depends upon our joint agreement to continue to share in his expenses ....

Should you chose at this point to make any of this a more formal agreement, please let me know. In lieu of that, we simply will act on the basis of the attached memo and trust that all will go well.

Sincerely,
Carriage House Meat and Provision Co., Inc.

4

Ketcham responded to Walter's letter on November 14, 1990.[3]

Carriage House purchased the necessary equipment in early 1991 and was ready to being processing turkey in April of 1991. However, Simmons' efforts to market the end products of the project were unsuccessful. Simmons therefore did not supply and Carriage House did not process any significant amount of turkey using the equipment purchased by Carriage House for the project. Simmons paid one-half of Carriage House's expenses relating to the project from May of 1991 to June of 1992.

--------

Marvin J. Walter

[3] The letter provides as follows:

Dear Marv:

Thank you for your letter of November 12th reaffirming your decision to move forward with the processing/packaging of our new turkey products. With everyone's participation, this can develop into a significant growth opportunity for both of our companies.

I have reviewed the November 6th letter to you from Joe Cooper and the only item that I would have some objection to is the fifth paragraph in which Joe says that, "Hubbard/Simmons would probably agree to take over the modified atmosphere packaging equipment if there actually was a termination after 15 months." As Jeff Lea and I recall the conversation, our statement was that if the project was successful to the point where it made economic sense for Simmons to process/package these products ourselves, we would certainly consider purchasing the modified atmosphere packaging equipment from Carriage House if a suitable purchase arrangement could be reached.

Jeff Lea and I will continue to work closely on this project and we will be in touch with Joe Cooper.

Cordially,

Ronald D. Ketcham
General Manager

Carriage House brought this action in March of 1993 claiming Simmons had guaranteed that after an initial start-up period it

would supply 50,000 pounds of turkey per week for processing and packaging by Carriage House. During trial Carriage House claimed damages in the amount of $1,237,464 for out-of-pocket expenses and lost profits. The jury awarded $96,794 to Carriage House.

## II. Standard of Review

We review de novo the district court's denial of a motion for judgment as a matter of law, using the same standards as the district court. Smith v. World Insurance Co., 38 F.3d 1456, 1460 (8th Cir. 1994) (citations omitted). We have explained that:

> A motion for judgment as a matter of law presents a legal question to the district court and this court on review: "whether there is sufficient evidence to support a jury verdict." White v. Pence, 961 F.2d 776, 779 (8th Cir. 1992). We view the "evidence in the light most favorable to the prevailing party and must not engage in a weighing or evaluation of the evidence or consider questions of credibility." Id. Judgment as a matter of law is appropriate only when all of the evidence points one way and is "susceptible of no reasonable inference sustaining the position of the nonmoving party." Id.

Keenan v. Computer Assoc. Int'l, Inc., 13 F.3d 1266, 1268-69 (8th Cir. 1994).

## III. Decision

To establish liability on the basis of promissory estoppel, the plaintiff must establish three essential elements:

> (1) A clear and definite agreement;
> (2) Proof that the party seeking to enforce the agreement reasonably relied upon it to his detriment; and
> (3) A finding that the equities support enforcement of the agreement.

Uhl v. City of Sioux City, 490 N.W.2d 69, 73 (Iowa App. 1992)

(citations omitted).  The jury found Carriage House established these elements.

The Iowa courts have not explicitly defined "a clear and definite agreement," but the Supreme Court of Iowa compared and contrasted three cases involving this element.  National Bank of Waterloo v. Moeller, 434 N.W.2d 887, 889 (Iowa 1989) (discussing In re Estate of Graham, 295 N.W.2d 414, 418-19 (Iowa 1980); Johnson v. Pattison, 185 N.W.2d 790, 795-97 (Iowa 1971); Miller v. Lawlor, 66 N.W.2d 267, 272-75 (Iowa 1954)).  The Moeller court explained:

> By way of distinguishing these cases, we observe that Miller, and Pattison, unlike Graham, demonstrated a clear understanding by the promisor that the promisee was seeking an assurance upon which he could rely and without which he would not act.  See Miller, 245 Iowa at 1155, 66 N.W.2d at 274.  This dual emphasis on clarity and inducement parallels the Restatement (Second) definition of an agreement for purposes of promissory estoppel as "[a] promise which the promisor should reasonably expect to induce action ... on the part of the promisee."  Restatement (Second) of Contract § 90 (1981).

434 N.W.2d at 889.

Simmons admits it had an agreement with Carriage House whereby Simmons would supply raw turkey meat, Carriage House would process and package it and Simmons would market the end products.  Simmons, however, claims there is not sufficient evidence in the record from which a reasonable juror could find by a preponderance of the evidence that Simmons made an oral guarantee to supply 50,000 pounds of turkey per week to Carriage House for processing following an initial start-up period.  Rather Simmons asserts the 50,000 pounds per week figure was a goal that all parties hoped to achieve and even surpass.  We agree with Simmons and find the evidence is not susceptible to a reasonable inference that the parties had a clear and definite agreement containing a poundage guarantee by Simmons.

8

The evidence in the record does not point toward the existence of a poundage *guarantee* by Simmons, rather it points toward the existence of a 50,000 pound per week *goal or projection* by the parties. The only evidence of such a guarantee is the testimony of Walter who stated in a general manner that Simmons made a poundage guarantee at some unidentified point in time. Walter identified Ron Ketcham and Jeff Lea as the individuals that "indicated to us" that 50,000 pounds per week "would be the minimum." Appellant's Appendix, p. 71. Walter does not identify to whom such an "indication" was made or when it was allegedly made. There is no evidence of an actual conversation wherein an individual representing Simmons stated to someone representing Carriage House that Simmons would *guarantee* Carriage House would receive 50,000 pounds of turkey per week to process and package. When considered in light of the documentary evidence Walter's testimony is not susceptible to a reasonable inference that a clear and definite agreement containing a poundage guarantee existed between the parties.

Although Walter testified he would not have proceeded with the project without a poundage guarantee from Simmons, there is no evidence that Simmons was aware of this information. Rather, Walter informed Simmons in his November 12, 1990 letter that Carriage House was going forward with the project despite not having a formal contract with minimal guarantees. See footnote 2, *supra*. Therefore, Simmons did not have "a clear understanding" that Carriage House "was seeking an assurance upon which [it] could rely and without which [it] would not act." *Moeller*, 434 N.W.2d at 889.

Cooper, the individual principally in charge of the project for Carriage House, never testified that anyone from Simmons made a poundage guarantee. Rather he testified the "input" he was getting from Jeff Lea was that 50,000 pounds per week "was probably on the light side." Appellant's Appendix, p. 110. Cooper spoke in

9

terms of "projections" rather than "guarantees" when asked whether Simmons made a poundage guarantee.  Id. at 118.  Cooper's testimony is not susceptible to a reasonable inference that Simmons made a poundage guarantee to Carriage House.

The written communications between the parties establish that Simmons refused to guarantee 50,000 pounds per week.  The November 6, 1990 memorandum written by Cooper, Carriage House's principal negotiator in this project, stated that Ketcham would not make a poundage guarantee and even if Simmons did it would be less than the 50,000 pounds per week suggested by Carriage House.  See footnote 1, supra.  Walter incorporated this memorandum in his November 12, 1990 letter in which he informed Ketcham that Carriage House was going forward with the project and would be purchasing the necessary equipment.  See footnote 2, supra.  Walter stated in this letter that Carriage House would act on the basis of the Cooper memorandum and he acknowledged that Carriage House was proceeding without a formal contract containing minimal guarantees.  Id.  The written communications between the parties points only toward the nonexistence of a poundage guarantee on the part of Simmons.

As we have found insufficient evidence to support the jury's finding of a clear and definite agreement, it is not necessary to discuss the two remaining elements of a promissory estoppel claim.

## IV.  Conclusion

For the reasons set forth above, we reverse the district court and grant Simmons' motion for judgment as a matter of law.

A true copy.

Attest:


CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

10