**AMANA SOCIETY, Appellee,**

v.

**COLONY INN, INC., an Iowa Corporation James C. Roemig, Donald C. Krauss, Eunice Krauss, and Ramon F. Goerler, Appellants.**

**No. 63269.**

Supreme Court of Iowa.

Jan. 20, 1982.

James F. Pickens, of Pickens, Barnes & Abernathy, Cedar Rapids, for appellants.

James W. Hall, Allan D. Vestal, and Carroll J. Reasoner, of Shuttleworth & Ingersoll, Cedar Rapids, for appellee.

LARSON, Justice.

The Amana Society, a business corporation owning virtually all of the farmland and much of the business property in the Amana Colonies, sought an injunction to prevent land previously conveyed by it from being used in a manner which was contrary to the "desires" of its board of directors. The defendants, all stockholders in the Amana Society and businessmen in Amana, challenged the board's right to assert control of their land on several grounds: They contended Iowa's "stale use" statute, § 614.24, The Code 1975, barred enforcement of the board's business restrictions; that the Society's attempts to enforce their land-use rules were state actions and resulted in the deprivation of property rights without due process; that the Society's actions resulted in an illegal restraint of trade; and that the Society was equitably estopped from enforcing the land-use restrictions. The defendants complained the Society's actions, moreover, were not calculated to preserve any land-use scheme but to protect its own business by suppressing competition.

After a lengthy trial, the court granted the injunction on the grounds that the defendants had expressly agreed to the Society's control over their use of the land, and that a "general scheme" of land-use control

existed. It concluded that the "stale use" statute, section 614.24, was constitutional, but held it was inapplicable in this case because a contract between the Society and the defendants, as shareholders, bound them to the Society's land-use restrictions independently of any deed restrictions. In determining that the Society had the right to control use of the land in the manner prescribed in the deeds, the court stated "the rights and powers of the Society under such deeds includes the right absolutely to decide whether a particular business can exist upon such land and the specific nature thereof. Said power includes the power to terminate a business permit at any time in its discretion." It held that if the Society had the power to terminate, it had the power to regulate "in detail" the nature and extent of business activities. The defendants appealed from the granting of the injunctions; the Society cross-appealed from the trial court's conclusion that section 614.24 is constitutional. Further proceedings were stayed pending disposition on appeal.

The principle issues raised on appeal are whether section 614.24 is constitutional and, if so, whether it bars the Society's action for an injunction under the facts of this case. We answer both in the affirmative. Our review is de novo. We are reluctant to interfere with a trial court's order for an injunction, Myers v. Caple, 258 N.W.2d 301, 305 (Iowa 1977); nevertheless, we feel compelled to do so under the record in this case. We reverse on the appeal and affirm on the cross-appeal.

There have been two Iowa corporations known as Amana Society. The present Amana Society, the plaintiff, is a profit corporation organized under chapter 491, The Code, and is the present owner of approximately 26,000 acres of land encompassing the area known as the Amana Colonies or Amana Villages, as well as substantial manufacturing, merchandising, and service enterprises.

The original Amana Society, predecessor of the plaintiff and former owner of the property, was a religious society founded in

Germany in 1714. The group, which was communal, was then known as the Society of True Inspiration. Approximately 800 of the members left Germany because of high land prices and religious persecution and emigrated to Ebeneezer, near Buffalo, New York, in 1843. When faced with encroachment by the City of Buffalo and increasing "worldly temptation," the religious group bought the Iowa land and moved there during the period of 1855–1860. The first Amana Society was incorporated in Iowa in 1859 as a religious, nonprofit corporation.

In the early days land-use control was no problem: the trustees of the corporation had total control over the use of the land and over what businesses were to be maintained. Agriculture was the principal livelihood. Manufacturing of clothing and furniture, as well as meat processing, was only for the purpose of providing for the needs of the members of the Society, although excess production was sometimes sold to "outsiders."

The original Society remained a true communistic society; and the board of trustees, elected from the elders of the church, retained almost dictatorial control of the Amana Colonies, its land and its people. The trustees decided where the members were to work, where they would live, and to a certain extent, even whom they could marry. Virtually all property used by the members was owned by the Society, except for personal effects such as clothing. Needs of the members were met by the Society, which provided food, clothing, housing, and medical care. It also provided care for orphans and free burial for its members. Upon death, the Society paid to the member's family, in cash, the value of the decedent's accumulated interest in the holdings of the Society. This cash payment on death contributed to a drain on the cash reserve of the Society, which eventually resulted in changes in the Society and its land-use policies. The Society's cradle-to-grave care resulted in lack of motivation for many workers, and it became necessary to hire outsiders to work in the factories and on the farms, causing a further cash drain. These factors, and the general depression, caused the Society to reexamine its communal way of life. Some method had to be devised to restrict the cash outflow or the Society would fail. A committee was formed to study various alternatives and make recommendations to the trustees.

Sale of the Society's assets was rendered impractical by the depression. Another alternative was to eliminate a portion of its financial burdens by embracing some of the aspects of a free-enterprise system. The "Committee of 47," as it was called, decided on the second alternative. Its Plan of Reorganization was ultimately approved by the Society members and brought about the "Great Change," of 1932. This began the eventual conveyance of some land to private ownership, subject to the attached "strings" which are the source of this litigation.

The Plan of Reorganization provided for transfer of the original Amana Society's secular assets, including farmland, businesses, and homes, to a profit corporation to be known as the Amana Society (the plaintiff here), which was to be organized under the laws of Delaware; and the church buildings, cemetery land, and schools were to be transferred to a nonprofit corporation to be known as the Amana Church Society. Each member was to receive one share of common stock as well as one share of "prior distributive" stock for each year of service to the Society. Transfer of land from the original Amana Society was made, pursuant to the plan, to the two corporations. In turn, private members received title to some of the property owned by the new Amana Society corporation. Some businesses, which were not needed by the corporation, were transferred to private owners. Most of the real estate conveyed to members was residential, and in most cases was sold to its occupants, who used their prior distributive shares as collateral.

The Plan of Reorganization anticipated the Society's continued land-use control by providing that

[t]he corporation should endeavor at all times to maintain control of the real es-

tate now held by the present Society, and all deeds executed should, as nearly as they may be, contain reversionary clauses or restrictions, to the end that the control of the real estate be maintained by the new corporation.

The plan, however, provided for some discretion in the board:

The board of directors in this matter .... shall have the greatest discretion and may waive this provision, and they may adopt rules for the sales of real estate or interests therein to meet particular or changed conditions.

A form of deed was adopted by the Society to assure its continued control over the land. It provided for: (1) a utility easement to be reserved by the Society; (2) a right of first refusal in any proposed sale to an outsider or a corporation; (3) a prohibition on any construction on the land without consent of the Society; (4) restrictions on rental of the property; (5) a prohibition on the commercial use of the name "Amana" without the consent of the Society; and (6) most important to this case, extensive future control over the business use of the property by requiring all transfers to incorporate provisions requiring consent of the Society for operation of any business by the grantee or his successor in interest, providing for revocation of any such consent at any time, and automatic termination each April 1. The prescribed deed restriction provided:

This conveyance is made subject to the further restriction that the grantee herein, his or her successors, grantees, legal representatives or assigns, shall not engage in, conduct, maintain or operate on said real estate or in connection therewith any trade, business, occupation or any gainful pursuit without first obtaining the written consent of the grantor, which consent may be revoked at any time by the grantor; and if not revoked by the express act of the grantor shall automatically, and without notice or other action on the part of the grantor, expire on the 1st day of April next succeeding its issue; and any renewal or extension of such consent shall cease and expire on the 1st day of April next succeeding its date and may be revoked by the grantor in the same manner as the original consent or permission.

This provision, generally referred to as the "business permit" provision, has been used by the Society in virtually all of its conveyances since 1932, approximately 600 in number, including their deeds to all of the parcels involved in the present case. Two of these tracts were conveyed by the Society in 1932 and the third in 1949.

The business permit requirements presented no substantial problems for over forty years following the Great Change. New permits were requested and routinely granted; and although they "expired" each April 1, in accordance with the plan, they were renewed in virtually all cases. One board member testified the issuance of business permits was "automatic." However, a dramatic shift in the board's permit policies occurred as a result of increased tourist trade. Completion of nearby Interstate Highway 80 and the colonies' designation as a National Historic Landmark in 1965 resulted in a virtual explosion in tourism in the colonies from 1969 to 1974. Over a million tourists a year visited the colonies. In response, the tourist-oriented businesses expanded. In the period of 1969 to 1974 the number of gift shops more than doubled. Other businesses also increased dramatically. The board of directors, fearing the consequences of expanding tourist-oriented businesses, adopted a policy in 1974 that no more permits would be granted for such businesses. This total ban was replaced by a "permit policy" adopted by the board in 1976. While this policy ostensibly allowed for issuance of business permits upon compliance with its requirements, the effect of the policy was merely to continue the total ban on new tourist-oriented businesses. The Society still claims absolute discretion in the issuance of such permits, despite the existence of the permit policy. Members of the permit committee testified that while an applicant was bound by the terms of the permit policy, the permit committee was not; it could refuse to recommend issuance

of the permit even though the applicant had fully complied with the requirements of the permit policy. A member of the permit committee testified that it remained the "philosophy" of that committee not to issue any new business permits.

So virtually overnight the policy of the board had changed: While only ten to fifteen of several hundred business permit applications had been denied prior to 1974, primarily on "public nuisance" grounds, no permits were issued after the ban was imposed in 1974. In addition, existing permits began to be more carefully policed.

Testimony in this case, as well as the various documents—principally the Plan of Reorganization—relied upon by the board in the exercise of its power, reveals the vast potential of the Society's power over land use control: It may discriminate in the issuance of business permits and may arbitrarily refuse their issuance. If it issues a permit, it may revoke it at any time, apparently without cause, notice,[1] hearing, or compensation for resulting loss. All permits expire each April 1, automatically. The board has the power to, and does, refuse to issue a permit for any business which "materially competes" with the Society's own businesses, which are numerous. It may (although a board member says it "probably wouldn't") expand into new areas and revoke the permits of existing businesses to remove competition.[2] It may, although it usually does not, control the rental of business property and may control the sale of it in some cases through its right of first refusal. On the other hand, while the Society claims broad rights to control private businesses through business permits, no permit at all is required for any of the Society's businesses or for any business on property owned by it.

Encouraged by the burgeoning tourist trade, and in some instances, emboldened by rumors circulating through the colonies that the board's method of land-use control was questionable under the "stale use" statute, businessmen and potential businessmen began to be more assertive. Competition became more intense. The Society, which had become increasingly involved in tourist-oriented businesses, openly admitted through its board that it was going to protect itself by enforcing its policy of restricting competition. The growing tide of commercialism was thought by some board members to be threatening the unique character of the colonies, therefore justifying restrictive measures.

The board of the Society viewed the ensuing landowners' resistance as a challenge to the authority vested in it by the Plan of Reorganization, a breach of the agreement by the owners to abide by the board's rules and, in general, a threat to the only available method of land-use control. The landowners, on the other hand, saw the board's actions as a violation of section 614.24, which barred the enforcement of the use restrictions, and an illegal infringement of their rights in their own property. The Society, they claimed, was not nearly as interested in land-use control as it was in controlling competition with its own businesses. The resulting conflict divided the businessmen of the colonies and the board itself. For example, defendant Donald Krauss, who owns a winery, is a pharmacist employed by the Society in its Amana drug store. He is also a member of the board of directors of the Society. Under a different hat, he has sued himself. Krauss' brother is also a member of the board, as is Martin Roemig, a half-brother of the defendant James C. Roemig. The board of directors of the Society was divided. The Society's president and some of the board members

1. The board's permit policy now provides for a two-year notice before revocation; however, it does not consider itself bound by the policy, so the effect of such an ameliorative rule is doubtful.

2. The possibility of this type of expansion apparently prompted the original adoption of the one-year limitation on business permits. A letter from the Society's attorney advised that "the corporation might at some future time desire to enter the business being conducted on the real estate, in which event it would desire at the earliest possible time to remove competition."

testified the board's actions were arbitrary and discriminatory; some feared the legal battle would split the community. Other board members testified in favor of the board's actions. All of the defendants are stockholders in the corporation which has sued them.

Defendants Colony Inn, Inc. and James C. Roemig are the owner and operator, respectively, of a business known as The Kitchen Sink in the colonies. The Society's deed to the original owner contained the "business permit" restriction set out above. Roemig attempted to get a permit, but the Society advised him there was a "moratorium" in effect and refused to grant it. He made other attempts after the 1976 permit policy was adopted and was again refused. He opened his business anyway, claiming that any authority the board might have had under the use-restriction provisions of the deed was terminated by section 614.24, and that the board's actions were barred on constitutional and equitable grounds.

Defendants Donald and Eunice Krauss operate the Village Winery in the colonies, which holds a permit for the sale of wine and "wine-related" gifts. They have been selling merchandise which the Society says is not wine-related and therefore in violation of the permit. The Krausses claim the term "wine-related" is so vague it is unenforceable and that the board has never adopted a definition of it in its permit policy. They, too, contend the actions of the Society are barred by section 614.24 and are illegal upon constitutional and equitable grounds.

Defendant Ramon Goerler operates the Old Wine Cellar Winery in the colonies. His permit was originally for the sale of wine but was later amended to add "gifts." He has been selling sausage and cheese, and the Society contends these sales are in violation of his permit. Goerler contends the items are properly considered as gifts and points to the Society's own Amana Meat Market, which had sold over $200,000 per year in meat and cheese packaged and advertised as gift items. Goerler also challenged the Society's authority on the statutory, constitutional, and equitable grounds relied upon by the other defendants.

I. *Application of section 614.24, The Code.*

Section 614.24 provides:

No action based upon any claim arising or existing by reason of the provisions of any deed or conveyance or contract or will reserving or providing for any reversion, reverted interests or use restrictions in and to the land therein described shall be maintained either at law or in equity in any court to recover real estate in this state or to recover or establish any interest therein or claim thereto, legal or equitable, against the holder of the record title to such real estate in possession after twenty-one years from the recording of such deed of conveyance or contract or after twenty-one years from the admission of said will to probate unless the claimant shall, by himself, or by his attorney or agent .... file a verified claim with the recorder of the county wherein said real estate is located within said twenty-one year period. In the event said deed was recorded or will was admitted to probate more than twenty years prior to July 4, 1965, then said claim may be filed on or before one year after July 4, 1965. Such claims shall set forth the nature thereof, also the time and manner in which such interest was acquired. For the purposes of this section, the claimant shall be any person or persons claiming any interest in and to said land or in and to such reversion, reverter interest or use restriction, whether the same is a present interest or an interest which would come into existence if the happening or contingency provided in said deed or will were to happen at once. Said claimant further shall include any member of a class of persons entitled to or claiming such rights or interests.

None of the Society's board members, except its manager, were aware of the existence of section 614.24 until approximately 1975. The manager had become aware of it in approximately 1972, but testified he

did nothing to alert the board at that time, because it was too late to file claims extending the life of the deed restrictions, and he feared that if knowledge of the statute was disseminated it would lead to problems in the colonies. The Society, without conceding the applicability of section 614.24, filed claims in 1975 pursuant to the statute to extend the life of the use restrictions in all previous Society transfers.

The Society admits no claims were filed as to these tracts until after the July 4, 1966, deadline. However, it seeks to avoid the effect of section 614.24 by arguing that: (1) it is inapplicable by its terms; (2) it is inapplicable under the facts, because the defendants are bound by a general scheme of land use, and by their express and implied contracts with the Society in which they agreed to be bound by the same terms as found in the deed restrictions; (3) it is unconstitutional on several grounds; (4) the 21-year claim limitations period had been tolled; (5) the defendants were estopped to rely upon the statute; and (6) its application under these circumstances would be inequitable, inconsistent with its purpose, and against public policy. We will discuss each argument raised, but in slightly different order.

A. *Coverage under the language of the statute.* The Society contends section 614.24 is inapplicable, by its terms, for three reasons: the Society is not a "claimant"; the deed provisions are not "reversion[s], reverted interests or use restrictions"; and this action is not one to "recover or establish any interest" in the defendants' properties.

(1) The Society contends it is not a "claimant" under the statute, because claimants, according to the statute, are "persons claiming any interest in and to said land or in and to such reversion, reverter interest or use restriction whether the same is a present interest or an interest which would come into existence if the happening or contingency provided in said deed or will were to happen at once." The Society points out that the "Amana deeds," as they are referred to, do not provide for

triggering of a reversion upon the occurrence of a specified event.

■ We do not read the statute so narrowly. The future "happening or contingency" which the Society claims is lacking here is not required; the statute says a claimant is a person claiming a present interest *or* one arising upon occurrence of a future event. The interests embodied in the Amana deeds, which the Society asserts are present interests, do not require the occurrence of any future event. We also believe, for purposes of the statute, there is a "happening or contingency" in the Amana deeds which, although unspecified, is nonetheless real: the happening or contingency is whatever the board might say it is because, in effect, it claims that authority under the deeds. We have held the definition of "claimant" under section 614.24 should be liberally construed. *Chicago and North Western Railway v. City of Osage,* 176 N.W.2d 788, 791–94 (Iowa 1970) ("person or persons" as claimants includes municipality). When the statute is read in that light, we believe that under either the present-interest or the future-event rationale, the Society is a "claimant" for purposes of section 614.24.

(2) Are these provisions of the Amana deeds "reversion[s], reverted interests or use restrictions" under the statute? The defendants do not contend they are reversions or reverted interests, but that they are "use restrictions." The Society contends the deed provisions do not fall within any of the categories. It argues they are not the kind of use restrictions envisioned in the statute because the deeds do not restrict the use of the land to specified purposes as, for example, in the case of a deed for school purposes or one which limits the type of structure permitted on land. The Society cites a law review article which quotes one of the draftsmen of the statute:

[I]t was not the intent of those who prepared the bill to include [affirmative grants or reservation of property interests] within the ambit of the limitation act. What we were trying to do was to limit stale uses and reversions and not to

bar interest in land granted or reserved. We are trying to distinguish a *negative* easement or a perpetual right of reentry. An "easement" providing for use and occupancy of land is an entirely different class from a restriction on use imposed on a grantee of the land.

*See* Ryman, *The Iowa "Stale Uses and Reversions Statute": Parameters and Constitutional Limitations*, 19 Drake L.Rev. 56, 63 (1969). Marshall and other commentators have noted the lack of certainty in the statute as to the interpretation of "use restriction." J. Marshall, *Iowa Title Opinions and Standards* § 12.3(A), at 274 (G. Madsen ed. 1978); A. Vestal, *Iowa Land Use and Zoning Law* 417–20 (1979); Ryman, *supra* at 61; Note, *The Mechanics of Iowa's Marketable Title Legislation*, 22 Drake L.Rev. 326, 332–33 (1973). The problem is whether the stale-use statute will bar claims based upon an affirmative grant of a right to use property of another or a reservation of a permanent right in property by a grantor, sometimes called an "affirmative" easement, as well as those based upon a "negative" easement, or a restriction on use imposed upon a grantee. As to this distinction, one authority has observed that

> [i]n the opinion of the sponsors of the act, the "uses" referred to are those which may be called "negative easements"—a restriction on the use of one's own land—rather than an "affirmative easement"—the right of a limited use of the land of another. Of course, even an affirmative easement may become stale, may be barred by "adverse" possession for the statutory period, and may be subject to an action to quiet title.

J. Marshall, *supra* at 274; *accord*, A. Vestal, *supra* at 418. The Society argues that because the statute was not intended to affect an affirmative grant of a right to use the property conveyed, it does not cover the restrictive provisions of the Amana deeds, which, it argues, are "analogous" to its right to maintain waterlines and sewers. The future use restrictions and utility easements are "analogous" only in that they involve rights asserted in the property of another; they are not the same for this purpose.

For purposes of applying the stale use statute, we hold the deed restrictions on the business use of the properties to be "negative" easements subject to the statute as "use restrictions." *See* J. Marshall, *supra* at 274. This conclusion is supported by our general view that the statute should be liberally construed to further the purpose of its enactment. *Calamus Community School District v. Rusch*, 299 N.W.2d 489, 490 (Iowa 1980); *Compiano v. Kuntz*, 226 N.W.2d 245, 248 (Iowa 1975); *Chicago and North Western Railway*, 176 N.W.2d at 794.

Other issues, such as the effect of section 614.24 upon the Society's retained utility easements and restrictions on use of the name "Amana," have not been raised, and we do not decide them. For purposes of this opinion "use restrictions" refers only to the business-permit provisions of the Amana deeds.

(3) The Society also contends section 614.24 is inapplicable because this action is not one to "recover or establish any interest" in the defendants' properties. The statute, it is claimed, is aimed at actions based upon reversionary or reverter interests in which the claimant attempts to "get the property back." While it clearly provides authority for that type of action, there is nothing in its language or the rationale underlying its enactment, *i. e.*, limiting and simplifying the scope of the title search, *Compiano v. Kuntz*, 226 N.W.2d at 248, which suggests it has such a narrow scope. While the present action is one for an injunction, not for the recovery of real estate, its success nonetheless turns on whether the use restrictions are valid. As already discussed, section 614.24 should be construed liberally; when it is read in that manner, this action is clearly one to "establish [an] interest" in the real estate.

B. *Tolling of the statute's time limitation.* The Society argues that the 21-year time limitation under section 614.24 has been tolled because the defendants were aware of the Society's regulatory scheme since its inception, and "[u]ntil the

activities occurred which are complained of in this case, there was no reason for anyone in the colonies to feel that the regulatory scheme would not be followed." The Society's belief that no one would challenge the restrictions, even if it were well-founded, is irrelevant; the statute provides the 21-year limitation period on claims runs from the recording of the deed, not from the time the potential claimant learns of a challenge to the restrictions. No authority is cited to support the argument, and we believe there is none. The argument is without merit.

■ C. *Constitutionality of section 614.-24.* The Society attacks the statute on the grounds it violates substantive and procedural due process (on notice grounds), impairs the obligation of contract, and is impermissibly vague (as a specific challenge on procedural due process grounds). As to all of these grounds, of course, the Society confronts a strong presumption of constitutional validity. *See State v. Sullivan,* 298 N.W.2d 267, 270 (Iowa 1980); *Miller v. Iowa Real Estate Commission,* 274 N.W.2d 288, 291 (Iowa 1979); *Presbytery of Southeast Iowa v. Harris,* 226 N.W.2d 232, 237 (Iowa), *cert. denied,* 423 U.S. 830, 96 S.Ct. 50, 46 L.Ed.2d 48 (1975).

■ (1) We initially upheld the constitutionality of section 614.24 on substantive and procedural due process grounds in *Presbytery,* 226 N.W.2d at 234–43. That view has been approved by at least one authority, J. Marshall, *supra* at 275–79, and has been reaffirmed by this court in the interval, *Calamus Community School District,* 299 N.W.2d at 490; *Compiano v. Jones,* 269 N.W.2d 459, 561 (Iowa 1978); *Compiano v. Kuntz,* 226 N.W.2d at 247. We adhere to that view here.

. (2) The Society contends section 614.24 is unconstitutional because it impairs the obligation of contract. It does not say whether it offends the federal or state constitution, or both; nor does it cite any authority for this position. Under our rules, a failure to

cite authority may be deemed to be a waiver of the issue. Iowa R.App.P. 14(a)(3), (b). We nevertheless address the issue because this court has never directly passed on it,[3] and because it will likely recur in the application of section 614.24.

Article I, section 21 of the Iowa Constitution provides that "[n]o . . . law impairing the obligation of contracts shall ever be passed." Similarly, Article I, section 10 of the federal constitution provides that "[n]o state shall . . . pass any . . . law impairing the obligation of contracts." However, as certain Supreme Court decisions have indicated, this prohibition is not an inflexible barrier to public regulation. *E.g., El Paso v. Simmons,* 379 U.S. 497, 85 S.Ct. 577, 13 L.Ed.2d 446 (1965); *Home Building & Loan Association v. Blaisdell,* 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413 (1934). As the Court in *Blaisdell* stated:

> To ascertain the scope of the constitutional prohibition we examine the course of judicial decisions in its application. These put it beyond question that the prohibition is not an absolute one and is not to be read with literal exactness like a mathematical formula. * * * The inescapable problems of construction have been: What is a contract? What are the obligations of contracts? What constitutes impairment of these obligations? What residuum of power is there still in the States, in relation to the operation of contracts, to protect the vital interests of the community?
>
> . . . . .
>
> Not only is the [contract clause] qualified by the measure of control which the State retains over remedial processes, but the State also continues to possess authority to safeguard the vital interests of its people. . . . Not only are existing laws read into contracts in order to fix obligations as between the parties, but the reservation of essential attributes of sovereign power is also read into con-

---

**3.** This ground of unconstitutionality was first raised on appeal in the *Presbytery* case. Because it had not been raised in the trial court, this court did not specifically rule on it. How-

ever, it is evident from dictum in the case, 226 N.W.2d at 234, that the court would not have held section 614.24 to be in violation of the contract clauses.

tracts as a postulate of the legal order. The policy of protecting contracts against impairment presupposes the maintenance of a government by virtue of which contractual relations are worth while,—a government which retains adequate authority to secure the peace and good order of society. This principle of harmonizing the constitutional prohibition with the necessary residuum of state power has had progressive recognition in the decisions of this Court. . . .

290 U.S. at 428, 429, 434–35, 54 S.Ct. at 236, 238–39, 78 L.Ed. at 423, 424, 426–27 (citations and footnotes omitted).

Broad language has been employed to determine whether a particular statute offends the contract clause:

[I]t is settled that . . . the "contract" clause . . . [does not have] the effect of overriding the power of the state to establish all regulations that are reasonably necessary to secure the health, safety, good order, comfort, or general welfare of the community; that this power can neither be abdicated nor bargained away, and is inalienable even by express grant; and that all contract and property rights are held subject to its fair exercise.

*Atlantic Coast Line Railroad v. Goldsboro,* 232 U.S. 548, 558, 34 S.Ct. 364, 368, 58 L.Ed. 721, 726 (1914). Turning to section 614.24, this court has acknowledged that it was enacted in furtherance of the general welfare, its purpose being to simplify land transfers:

We are persuaded the aforesaid statute clearly represent[s] a salutary attempt on the part of our General Assembly to keep pace with public demands for needed reforms in the field of land title conveyancing practices. As this court observed in *Chicago & North Western Ry. Co. v. City of Osage,* 176 N.W.2d at 793, [it is] "designed to shorten the period of search required to establish title in real estate and give effect and stability to record titles by rendering them marketable and alienable—in substance to improve and render less complicated the land transfer system."

*Presbytery of Southeast Iowa,* 226 N.W.2d at 236.

The question remains whether the underlying purposes of the statute are sufficient to justify its impact upon contractual obligations. The Supreme Court has stated:

It is manifest from . . . our [past] decisions that there has been a growing appreciation of public needs and of the necessity of finding ground for a rational compromise between individual rights and public welfare. The settlement and consequent contraction of the public domain, the pressure of a constantly increasing density of population, the interrelation of the activities of our people and the complexity to our economic interests, have inevitably led to an increased use of the organization of society in order to protect the very bases of individual opportunity . . . . *[T]he question is no longer merely that of one party to a contract as against another, but of the use of reasonable means to safeguard the economic structure upon which the good of all depends.*

*Blaisdell,* 290 U.S. at 442, 54 S.Ct. at 241, 78 L.Ed. at 431 (emphasis added). In the present case it appears that the means employed to implement the policies of the stale use statute are reasonable. It provides ample periods of time, depending on the date of contract, deed, will, or conveyance, in which a claimant may file a verified claim with the county recorder, a fact which the Society apparently does not dispute. Thus, the limitations periods are merely "reasonable means to safeguard the economic structure." *Id.* Moreover, the statute does not automatically affect established contractual rights, but merely modifies the procedure for their enforcement. *See Presbytery of Southeast Iowa,* 226 N.W.2d at 242. This distinction was noted by the court in *Evans v. Finley,* 166 Or. 227, 111 P.2d 833, 836 (1941), which held a statute requiring a renewal of the recording of chattel mortgages upon expiration of three years from date of maturity was constitutional even though the remedy of foreclosure would be lost if no renewal was made:

The effect of the statute is merely to cut off the remedy of the mortgagee by foreclosure upon the expiration of three years after the expiration of the obligation, leaving his every substantial right, unimpaired. And, even that result can be avoided by the filing of the renewal affidavit.

Application of the reasoning of these authorities leads to the conclusion that section 614.24 does not offend the contract clauses.

 (3) The Society does not specify which portion of the stale use statute suffers from vagueness; it merely cites a law review article in which the author summarily concludes "[t]he parameters of [the statute] are ill-defined, casting a shadow on valuable property rights, and leaving real doubt as to what interests are within its limits." *See* Ryman, *supra* at 72. Procedural due process in a noncriminal case requires only that a statute convey sufficiently definite warning as to proscribed conduct when measured by common understanding or practice. *Millsap v. Cedar Rapids Civil Service Commission*, 249 N.W.2d 679, 684 (Iowa 1977). The legislature need only give such warning that men may conduct themselves or their affairs accordingly. *See Rose v. Locke*, 423 U.S. 48, 50, 96 S.Ct. 243, 244, 46 L.Ed.2d 185, 188 (1975). Thus, a statute will be held constitutional "if its meaning is fairly ascertainable by reference to similar statutes, other judicial determinations and reference to the dictionary or if the words themselves have a common and generally accepted meaning." *Iron Workers Local No. 67 v. Hart*, 191 N.W.2d 758, 772 (Iowa 1971). Even though a statute may have been drafted more precisely, the Constitution will not necessarily be offended:

> Many statutes will have some inherent vagueness, for "[i]n most English words and phrases there lurk uncertainties." Even trained lawyers may find it necessary to consult legal dictionaries, treatises, and judicial opinions before they may say with any certainty what some statutes may compel or forbid. All the due process clause requires is that the law [must not suffer from a lack of fair warning.]

*Rose*, 423 U.S. at 49–50, 96 S.Ct. at 244, 46 L.Ed.2d at 188.

 In view of these principles and the strong presumption of its constitutionality, section 614.24 does not suffer from a lack of clarity. *See* J. Marshall, *supra*, § 12.3(A), at 275 n. 61; *see also Presbytery of Southeast Iowa*, 226 N.W.2d at 241. Further, if there were any doubt on the part of the Society whether the landowners' interests amounted to "reversions," "reverted interests," or "use restrictions," it could have easily filed claims with the county recorder within the specified time period. The Society does not claim it was misled by the language of section 614.24; its own evidence showed the board was unaware of the existence of the statute until after the claims period had expired.

## II. *The contract theories.*

The Society argues that, even assuming section 614.24 would otherwise be applicable and that it is constitutional, it is nevertheless inapplicable because of collateral agreements by the parties. It argues first that there is an express contract between the Society and each of the defendant landowners "requiring defendants to abide by the conditions contained in the Amana deeds and the desires of the board of directors of the Society with respect to the use of the land." This contract, according to the argument, is collateral to and independent of the deeds and is enforceable in spite of the limitations of section 614.24(2). The Society also argues that a similar implied agreement, between it and the defendants, bars the application of the statute.

A. *The express-contract argument.* In arguing that collateral express contracts remain enforceable without regard to section 614.24, the Society points to the language of the statute which requires a claim to be filed within 21 years "from the recording of such deed of conveyance or contract." Because the contracts relied upon were never recorded, the argument goes, the 21-year claim period had never commenced as to them. The trial court agreed:

The stale use statute only bars claims based on *recorded* deeds. * * * [The Society] is not seeking to enforce the provisions of any deed or contract *of record,* but to enforce the terms and provisions of an *unrecorded,* separate, distinct, collateral agreement, which the court feels [the Society] has proven exists. Section 614.-24 does not preclude the enforcement of such a collateral, express contract among the parties themselves and those with actual notice thereof. An unrecorded deed, mortgage, lease or other instrument affecting title to land is valid as among the parties thereto and those claiming under them who have notice thereof. This rule is one of universal application and is followed in Iowa. * * * Defendants were parties to the express contract referred to above, had notice of it, and are therefore bound by it.

█ As a general proposition it is true that express agreements concerning the use of land may be enforced against a party to the agreement even though they are not recorded. Such actions are based on general contract law; they are not concerned with the creation of interests in land. *See* A. Vestal, *supra* § 11.21, at 420. For example,

[w]hen a shopping center is developed, the developer enters into a lease arrangement with the tenants in the center. Along with the transfer of an interest in the property involved (the leasing of an area in the center), a contract is entered into between the parties concerning a number of different important factors. The hours of the operation of the stores, the advertising costs to be shared, the providing of security for the center, the line of goods which may be sold by each of the stores—all of these may be the subject of an agreement between the lessor and the lessees. The contractual provisions may not be viewed as involving any interest in real property, but certainly the contract is enforceable between the parties to the contract. Should either contracting party refuse to abide by the agreement concerning advertising, the courts would enforce the agreement.

*Id.* at 421 (footnote omitted). Because this is an action between the original parties to the contracts, the Society argues, recordation is not a prerequisite to enforcement of the use restrictions. In substance the Society's argument is that, regardless of whether the original use restrictions of the Amana deeds are enforceable, the collateral contracts, which embody the same terms, are.

The defendants, conceding that they and their predecessors in title entered into some of these agreements, answer the argument by citing several cases holding that contracts in violation of statutes are unenforceable. They include *Madrid Lumber Co. v. Boone County,* 255 Iowa 380, 121 N.W.2d 523 (1963) (construction contract entered into in violation of bidding and advertisement requirements of statute unenforceable); *Cornick v. Southwest Iowa Broadcasting Co.,* 252 Iowa 653, 107 N.W.2d 920 (1961) ("parties may not contract in defiance of a statute which regulates the subject matter of their agreement"); and *Iowa Electric Company v. Town of Winthrop,* 198 Iowa 196, 198 N.W. 14 (1924) (contract by city for purchase of electricity, not submitted to voters according to statute, unenforceable). We do not believe, however, that these cases are in point, because the "contracts" here were neither in *violation* of section 614.24, nor even necessarily inconsistent with it. They exist, if at all, collaterally to it. That does not make them unenforceable.

█ Under the Society's contract theory, this suit is not one to enforce the use restrictions of the Amana deeds, but one to enjoin the continued breach of a contract which contains identical provisions. Our problem with this theory is not whether the effect of section 614.24 may be avoided by a collateral contract, but rather with the Society's failure to prove the existence of such a contract. The Society claims the "express contract" is actually a conglomeration of documents and "various oral agreements or understandings which have existed among the Society, its stockholders and other people in the colonies." The documents include

the 1932 Plan of Reorganization, the Society's articles of incorporation and bylaws, as well as the "rules and regulations, decisions or policies enacted by the board [of directors]." All of these tangible and intangible muniments of this "contract," it is claimed, incorporate the "same provisions or requirements as are contained in the deeds, plus additional elements and requirements."

The Society relies to a great extent upon the 1932 Plan of Reorganization and its charge to the Society that it "endeavor at all times to maintain control of the real estate now held by the present Society and to assure this by deed restrictions," and that each of the persons signing it was bound by its provisions. It was signed by all of the members of the Society at that time, including the transferees in the Society's original deeds to the land involved here. It was not, however, signed by any of these defendants.

In 1932 the Society also adopted the form of deed incorporating the plan's use restrictions. This event, according to the Society, established a "policy or rule [which] became binding on all stockholders . . . and is valid and enforceable against them whether or not such provisions appear in a deed from the Society." In 1936 and 1937, additional policies of the board were adopted which detailed the extent of the Society's control, including a prohibition of competition by other businesses and a requirement that permits be obtained in order to conduct a business. Other muniments of this "express contract" include the Society's articles of incorporation and bylaws, which, it argues, incorporated the concept of land-use control envisioned in the Plan of Reorganization, as well as minutes of various stockholders meetings, including one at which those present voted to retain the existing land-use method.

Although the Society relies upon the fact the defendants agreed "to abide by the bylaws, rules and regulations of said Society as they now exist or as the same may be changed, altered or amended from time to time" when they signed the Society's 1972 stock register, the register dealt almost entirely with *stock* -transfer restrictions. Despite the defendants' apparent concessions to the contrary, it did not purport to bind them to the Plan of Reorganization, which is not even mentioned in it; and the articles of incorporation and bylaws, which are referred to in it, do not incorporate either the Plan of Reorganization or its business-permit provisions. Further, there was testimony at trial that the defendants did not understand they were binding themselves to such use restrictions when they signed the stock register. No other written agreement was shown to have been entered into by these defendants which could even arguably bind them to land-use restrictions.

In construing agreements restricting the use of property, we have applied a strict test:

> [R]estrictions on the free use of property are strictly construed against the party seeking to enforce them, they will not be extended by implication or construction beyond the clear and unambiguous meaning of their terms and doubts will be resolved in favor of the unrestricted use of property.

*Stockdale v. Lester,* 158 N.W.2d 20, 22 (Iowa 1968) (construction of restrictive covenants on use of lots in subdivision); *accord, Maher v. Park Homes, Inc.,* 258 Iowa 1291, 1296, 142 N.W.2d 430, 433 (1966) (suit to enjoin building in violation of restrictions); *Jones v. Beiber,* 251 Iowa 969, 971, 103 N.W.2d 364, 365 (1960) (suit to enjoin breach of restrictive covenant in deed). This rule has also been applied in construing zoning ordinances restricting the use of property. *See, e.g., Johnson v. Board of Adjustment,* 239 N.W.2d 873, 889 (Iowa 1976).

We cannot say that this assortment of written and unwritten agreements and "understandings" establishes a "contractual relationship . . . requiring defendants to abide by the conditions contained in the Amana deeds to their land and the desires of the board of directors with respect to the use of [defendants'] land," as contended by the Society. To do so would require us to imply such contract from the defendants'

broad agreements, contained in the stock register, to abide by the policies, rules, and regulations of the board of directors. We cannot extend such an agreement by construction or implication beyond its clear and unambiguous language. *Stockdale*, 158 N.W.2d at 22; *Maher*, 258 Iowa at 1296, 142 N.W.2d at 434. This is especially true in this case, where the restrictions are so severe. The Society does not contend, nor can it be seriously argued, that the defendants agreed to any specific future use restriction because those restrictions were subject to change, as has already been shown, virtually overnight. What the Society claims, in essence, is that the defendants .and other owners of Amana land agreed to give the board their proxies to control land use in the colonies as the board saw fit. As the Society's board president testified, a person in his "right mind" would not agree to be bound by all future rules of the Society. The only express agreement on land-use control was the 1932 Plan of Reorganization, and that was not signed by any of the defendants.

Under our rule of construction, any doubts about the applicability of the use restrictions must be resolved in favor of the free use of the properties. We conclude there is no clear and unambiguous language by which the defendants agreed to allow the Society to impose the use restrictions with which they are now confronted. The Society has failed to establish the express contract upon which it relies; the trial court erred in concluding it had.

■ B. *The implied contract argument.* The Society argues there is also an implied contract, to which all persons owning land in the colonies are parties, that restricts land use. It argues, as it did under its express contract theory, that enforcement of such collateral contract is not proscribed by section 614.24. Although the Society contends that since 1932 all persons living in the colonies have understood permission of the Society must be obtained to use property formerly owned by it and "have conducted their activities" accordingly, this general understanding appears, at

most, to be acquiescence in the board's exercise of power. There is no "clear and unambiguous" understanding from which we may conclude that the defendants impliedly agreed to give the Society the broad power of land-use control it claims.

### III. *The general scheme.*

■ The second basis upon which the trial court granted the Society's injunction is known as the "general scheme" of land-use control. This theory, based on principles of estoppel, applies where there has been general compliance with, and reliance upon, a land-use plan, even if there is no specific agreement on it. The rationale is that when all of the individuals involved have followed a general use plan and have come to rely upon it, it would be inequitable to deny enforcement of it. *See* Vestal, *supra* § 11.21, at 424–27.

The trial court, in concluding that a general land-use scheme was established, stated:

The general scheme which exists in the colonies is evidenced by the existence of numerous unrecorded documents, a course of conduct which has been followed *and* the Amana deeds, many of which clearly have not been affected by 614.24. The general scheme is not based solely on the existence of the deeds of record but also on other evidence, people's intentions and a long course of conduct which precludes persons who have had knowledge *thereof*, have been involved in it and who have relied upon it from denying the enforceability of it against them. Such is the case with the defendants. Under the rule enunciated in the cases referred to above, the system of land use control which [the Society] has proven has existed in the colonies for over 100 years may be enforced with respect to defendants' land, even though the deeds to their land themselves may not be able ·to be enforced because of 614.24. The method which has existed in the Amana Colonies to control land use has been understood and relied on for many years. The restrictions are for the benefit of all

of the property owners in the area and all property owners there are entitled to the benefits of the scheme.

■ We have held that if there is a general plan of land use which has been "understood, accepted, relied and acted upon by all in interest, it is binding and enforceable on all purchasers with notice." *Grange v. Korff*, 248 Iowa 118, 126, 79 N.W.2d 743, 748 (1956); *accord, Hegna v. Peters*, 199 Iowa 259, 265, 201 N.W. 803, 805 (1925). Even if use restrictions are not contained in instruments of conveyance, and there are no other agreements to limit use of property, a general scheme of use restriction is nonetheless binding on those grantees having notice of the plan. *See Grange*, 248 Iowa at 127, 79 N.W.2d at 749; *Hegna*, 199 Iowa at 264, 201 N.W. at 805. The principle is based on equity and fair play, and the prevention of fraud. Vestal, *supra* § 11.21, at 427.

■ The facts in the present case are distinguishable from those in the cases mentioned above, and in the additional cases cited by the Society. Those cases all involved specific, identifiable use restrictions. No one owning property in the Amana Colonies can presently say he "understands, accepts, and relies upon" specific use restrictions, because there are none. The gist of the general-scheme principle is that it will increase stability and fairness in land use, and that persons relying on an existing scheme of land use should be able to enforce it. The "general plan" in this case is that there shall be no binding plan at all, that land-use control will be whatever the board of directors might say it is. This form of control is the antithesis of stability; no one could build a house with any assurance that the board would not permit a rendering plant to be built next door, or start a business with any assurance that the board would allow him to continue operating it.

The extent of its claim of land-use control and the amorphous nature of it are illustrated by the Society in its brief where, in discussing defendant Goerler's business, it states:

The Society's position is that Goerler, like anyone else owning land subject to an Amana deed, should only be able to do on that land *what the Society Board deems appropriate.* This has been the system and understanding of the people of the colonies since 1932.

(Emphasis added.)

Rather than promoting stability and fairness in land use, the Society's version of the general scheme theory here would create instability and foster unfairness. A general scheme of land use, with the degree of specificity envisioned by the rule, was not established. We conclude the trial court erred in granting the injunction against the defendants on this basis.

IV. *Promissory estoppel.*

The *Restatement (Second) of Contracts* provides a remedy for a party who has relied, to his detriment, on the promise of another:

A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

*Restatement (Second) of Contracts* § 90(1), at 242 (1979). We noted the elements of promissory estoppel in *In re Estate of Graham*, 295 N.W.2d 414, 418–19 (Iowa 1980):

(1) a clear and definite agreement, (2) proof that the party seeking to enforce the agreement reasonably relied upon it to his detriment, and (3) a finding that the equities support enforcement of the agreement.

*See Warder & Lee Elevator, Inc. v. Britten*, 274 N.W.2d 339, 342–43 (Iowa 1979); *Merrifield v. Troutner*, 269 N.W.2d 136, 137 (Iowa 1978); 1A A. Corbin, *Contracts* § 200, at 215–21 (1950). The leading Iowa case involving application of promissory estoppel in the context of land-use restriction is *Miller v. Lawlor*, 245 Iowa 1144, 66 N.W.2d 267 (1954). In *Miller*, the court found a specific,

oral agreement by a landowner not to construct a house in such a way as to block his neighbors' view. The court found reliance on that agreement and held the defendant was estopped from asserting the statute of frauds. Granting of an injunction was affirmed. Also, in *Johnson v. Pattison*, 185 N.W.2d 790 (Iowa 1971), this court held that there was a promissory estoppel where the defendants' grantors agreed to use the property only for residential purposes, that defendants took title with knowledge of that promise, and that the plaintiff had relied upon the agreement. The court also noted that "in applying this doctrine each case must be decided in the light of its surrounding facts and circumstances. There can be no hard and fixed rule for determining when it is appropriate." *Id.* at 795.

In applying the elements of promissory estoppel to the facts of this case, we note there was no "clear and definite agreement" as to what use restrictions were applicable as in *Miller* (neighbors' view would not be obstructed) and *Johnson* (land would be used only for residential purposes). As previously discussed in connection with the Society's claim of express and implied contracts, the only "agreement" it claims is that land-use control would be left to the board, without any limitation, other than the self-restraint of the board of directors. This promise, without definite terms, is illusory and makes the theory of promissory estoppel inapplicable to this case. *See* 1A Corbin, *supra* § 201, at 223–26. In addition, we conclude the third element of promissory estoppel has not been established: for the reasons discussed in the following division, we believe the Society has failed to show that the equities support enforcement of the agreement. Because the record fails to establish the essential elements of promissory estoppel, we reject the argument.

### V. *The public-policy and equity arguments.*

The Society contends the unique physical and social character of the Amana Colonies are priceless assets which have been preserved, at least to this time, by its land-use control. It argues that if this control is lost, the unique character of the colonies will be lost, forever, because no other means exist for control. The colonies are not incorporated as a municipality, and Iowa County has no applicable county zoning. The Society argues that applying the stale use statute to terminate its control would extend the statute beyond its intended use, which is barring *stale* uses. The restrictions remain viable and essential to the integrity of the area, according to it, and to hold the restrictions unenforceable would make the colonies "wide open for the kind of commercial exploitation which has resulted in other areas of tourist interest."

We take judicial notice of the extraordinary historic, cultural, and architectural value of the colonies; however, the argument that the statute is inappropriate in the case of the Amana Colonies should have been addressed to the legislature, not to this court. We take the statute as we find it, and we find nothing within it which suggests the play in the joints the Society now seeks. In an earlier case dealing with the construction of marketable title legislation, we said:

It may be the legislature did not intend this provision to apply to such a case as present. However, as we view it, the language of the statute is plain and unambiguous. Nor are we concerned with the policy of the lawmakers in enacting this measure. We may observe, however, that there can be little doubt of the desirability of statutes giving greater effect and stability to record titles. We believe it is our duty to enforce this statute as written.

*Lane v. Travelers Insurance Co.*, 230 Iowa 973, 978–79, 299 N.W. 553, 555 (1941).

The construction of section 614.24 which the Society urges would go a long way toward defeating its purpose, which is to "provide a ready and reliable means for prospective real estate purchasers to ascertain if they are getting unencumbered title." *Compiano v. Jones*, 269 N.W.2d at

462. In *Compiano*, we also said, "[i]t is vital that one who searches the records should know where to look and should know, too, when he need look no further." *Id.* If we were to give effect to the various plans, agreements, and "understandings" the Society urges in avoidance of section 614.24, a title examiner would not know where to start, or end, a title search. We would effectively emasculate the statute.

We cannot accept the Society's public-policy argument, either. We do not believe the colonies are without other effective means of land-use control, as the Society laments. It has made only a negligible effort to implement county zoning or to incorporate. More important, chapter 303, The Code, contains provisions for establishment of historical preservation districts which would apply to the colonies. This chapter was drafted by the Society's attorneys after possible problems under section 614.24 were brought to the attention of the board, and the Society oversaw the successful presentation of the bill in the General Assembly. Obviously tailored to the needs of the Amana Colonies, this law provides protection for "areas of historical significance." *See* §§ 303.20—.34, The Code. It provides for preservation of areas such as the colonies through districts not exceeding 160 acres in size. The purpose of the 160-acre limitation was said to be to allow each of the colonies to decide for itself whether to become a district. Control of future development would be the responsibility of commissions in each district, rather than the Society, and the membership of the commissions would be elected by the residents of the districts, in contrast to the present system, in which only Society members elect its directors. (Less than one-third of the present residents of the colonies are members of the Society.)

The draftsmen of a Society-ordered development plan, as well as many residents of the colonies, have urged the Society to implement the new historical-preservation law; however, it has failed to do it. One witness said this was because there was an omission in the statute to provide for funding the costs of the referendum elections necessary to establish the districts; another testified it was due to a lack of impetus within the colonies themselves. In any event, there was no evidence to show the Society has made any attempt to secure the necessary statutory amendments to cure the alleged deficiency or to encourage the residents of the colonies to get the project underway. If the Society's fear is well-founded that the colonies would self-destruct by allowing the unchecked growth of commercialism, other remedies are available to it through zoning or implementation of the very statute it conceived.

The Society also contends the defendants are estopped to rely upon section 614.24. It merely refers to the argument and authorities cited under its promissory estoppel argument. We reject this estoppel argument for the same reasons we rejected that one.

We address one other matter. Each of the sides in this litigation asks us to look at the equities of its position or, more precisely, the inequities in the other's. From the standpoint of equity, we note the possibility of abuses if we were to sanction the Society's broad claim of power. In particular, there is the spectre of a virtual Society takeover of private businesses. If it has the authority, as it claims, to revoke permits more or less at will, there appears to be nothing to prevent it from arbitrarily revoking the permits of businesses in competition with it, either in its present businesses, or those in which it may become involved in the future. The Society already has substantial business interests in farming, manufacturing, and retail businesses, and it is expanding those interests. This scenario, alluded to earlier in this opinion, was presented to a board member on cross-examination: Assume there were several wineries owned by private businessmen, and the Society decided to get into the wine business. Could the Society revoke the business permits of its potential competitors? The board member responded that the Society "probably wouldn't" but implied that it could. While we do not suggest the Society would attempt such action, we nevertheless believe the rules of the board,

if given full effect, would in fact allow just such a result.

George Foerstner, a former board member of the Society and now president of Amana Refrigeration, testified about his company's stake in the future well-being of the colonies in which his company is based and in which many of the employees live. The Society's permit practices, he testified, did not serve to preserve the colonies, but in fact divided them. He thought municipal zoning would be preferable to board control, which he characterized as "un-American and improper." He cited the possibility of board abuses under the present system and noted, as an example, that the owner of a restaurant built at considerable expense would find himself out of business if the board refused to renew his business permit. He stated that his alternative, municipal zoning, would be fairer and would provide for input by all the residents of the colonies, not just Society members.

■ We cannot permit the power of a court of equity to be used to place its imprimatur upon the board's policies, even though the possibilities of abuse might seem remote: "Injunctions are never granted when they are against good conscience, or productive of hardship, oppression, injustice, or public or private mischief...." 42 Am.Jur.2d *Injunctions* § 56, at 798 (1969). As stated in *Johnson v. Pattison*, 185 N.W.2d at 797:

> Equity usually invokes its extraordinary injunctive power only when necessary to prevent irreparable harm or when the complaining party is otherwise without an effective remedy. If the injury is light and an injunction would result in serious hardship or loss to defendant, courts have refused to enjoin, leaving the plaintiff to his claim for damages.

We have examined the record and all of the arguments advanced by the Society and conclude an injunction is not warranted. Because we conclude the trial court erred in granting the injunction on the grounds discussed, it is not necessary to address the remaining arguments of the defendants.

The case is reversed on the appeal; on the cross-appeal by the Society, we conclude section 614.24 is not unconstitutional on any of the grounds urged and therefore affirm the trial court.

REVERSED ON APPEAL; AFFIRMED ON CROSS–APPEAL.

All Justices concur except REYNOLDSON, C. J., and McGIVERIN, J., who dissent, and SCHULTZ, J., who takes no part.

REYNOLDSON, Chief Justice (dissenting).

I respectfully dissent. I believe that section 614.24, The Code, is at least unconstitutional as applied under the facts of this case that show a general scheme of land use control. See dissenting opinions in *Presbytery of Southeast Iowa v. Harris*, 226 N.W.2d 232 (Iowa 1975), and *Compiano v. Kuntz*, 226 N.W.2d 245 (Iowa 1975). Granted that section 614.24 is unconstitutional as applied, there are valid grounds that fully support trial court's ruling granting the injunction to plaintiff, Amana Society.

Our analysis ought to start with the premise that the Amana Colonies are sui generis, and that the controversies between the Amana Society and its stockholders may require an innovative resolution. There is abundant evidence here to support the following factual recital, taken from the parties' "Agreed Statement":

> Although changes have occurred in various aspects of life in the Amana Colonies since 1932, the Amanas and the people living there still constitute a unique, historical, cultural and sociological entity. Religion still plays a major role in the lives of the people. Many stockholders of the Society are still employees of the Society. The basic nature of the livelihood of the Society was originally agriculture. Agriculture, furniture making, woolen manufacture, the general stores and the meat shops are still major businesses of the Society. Tourism is now a chief source of livelihood in the Colonies. Many Amana customs still prevail. Family ties and relationships among the people are extensive. The Society still pro-

vides many of the benefits as a corporation which the religious Society did prior to 1932, including health care, assistance to those who cannot take care of themselves and free burial. The Amana people are very much aware of their historical and cultural significance and have extreme pride in their community and its physical environment. The number of outsiders living in the Colonies has not increased greatly.

For over 100 years this organization was able to retain many of the original physical characteristics of its society, first through landownership, and after 1932 through landownership and the technique of collateral express agreements with its stockholders, coupled with a general scheme of land use control. This land use control is evidenced by the concession in the "Agreed Statement" that there is an absence of fast-food establishments, movie theaters, nightclubs, bars, bowling alleys, and similar businesses in the Colonies. The record discloses that the board of the Society, through the device of business and building permits, maintained the original environment and character of the Colonies. For example, the board rejected applications for a concrete mixing plant, a Dairy Sweet, and a mobile home. It denied requests to purchase land for the creation of multiple dwellings.

Persons owning and operating businesses on three tracts of real estate now seek to demolish this system of control. Two of the parcels involved were conveyed by the Society in 1932, the other in 1949, and all are located in the older, historical area of the Village of Amana. All of these individual defendants are stockholders of the Society. They conceded the following on pages 10 and 11 of their brief:

The present owners of the real estate involved in this litigation and all of the people in the chain of title of each tract, either by virtue of signing the original Plan of Reorganization or having signed the common stock register of the Amana Society subsequent thereto, signed documents agreeing in writing to be bound by all of the provisions and agreement set forth in the Plan of Reorganization, Articles of Incorporation, By-laws, and Rules and Regulations of the Amana Society as they existed at the time of such agreement or as the same may have been changed from time to time.

(Emphasis deleted.)

These defendants made applications for business permits with respect to the use of their premises, as did other owners. Although they now claim they are unconstitutionally deprived of their property without just compensation, it would be logical to assume that any diminution in value of the premises resulting from these use restrictions would have been reflected in the price they paid for the real estate. Nonetheless, they now assert the unlimited right to use it as they see fit.

Defendant Roemig made an unsuccessful application for a permit to operate a gift and kitchenware shop on land owned by "Colony Inn, Inc.," in which he is a major stockholder. Nonetheless, he opened "The Kitchen Sink" in 1976. Defendant Krauss obtained a permit in 1973 to operate a winery and sell wine-related gifts. He constructed a large building and started to carry an extensive variety of low-quality, souvenir-type items. The wine was pushed into the background. The Society claims he is operating beyond the range of his permit and his activities must be confined. The Society makes a similar claim concerning activities of defendant Goerler, who added a "cheese shop" on premises where he had a permit for a winery and gift shop.

The majority's concern that in the future the board of directors of Amana Society may act arbitrarily or selfishly on behalf of the corporation brushes by this aggressive, history-breaking conduct of defendants, and ignores the remedy of the defendants and other stockholders who may replace the board. I find it unbelievable that these defendants, long-time residents of the area, stockholders, and successful business persons, did not know of the use restrictions on the premises or the obligations they assumed when they signed the Common Stock Registry. Trial court necessarily made the

same finding in holding Amana Society could enforce the provisions of a collateral, express contract between the Society and these defendant stockholders.

The evidence fully supported trial court's finding that a general scheme of land use control always has existed in the Amana Colonies. Those numerous witnesses who were asked testified it was common knowledge the consent of the Society had to be obtained to start a business, build a building, or sell land to a nonstockholder. Defendants acknowledged they had known for many years that the Society had controlled the use of land in the Colonies in many respects. They could not think of anyone in the Colonies who did not have that knowledge.

Where a general scheme of land use control can be proved, as here, it can be enforced against persons owning property within the affected area who have knowledge of it, whether or not the deeds or conveyances to their land actually contain the restrictions or the substance of the general scheme. *Grange v. Korff*, 248 Iowa 118, 124–25, 79 N.W.2d 743, 747 (1956); *Hegna v. Peters*, 199 Iowa 259, 262–63, 201 N.W. 803, 804 (1925); *see Johnson v. Pattison*, 185 N.W.2d 790, 794 (Iowa 1971); *Thodos v. Shirk*, 248 Iowa 172, 177, 79 N.W.2d 733, 736 (1956); *Miller v. Lawlor*, 245 Iowa 1144, 66 N.W.2d 267 (1954). If the Society could enforce the general scheme without the restrictions in defendants' deeds, it should be obvious, as trial court concluded, that the general scheme could be enforced. Further, trial court found, and the evidence fully shows, these defendants knew of the general scheme and have enjoyed its benefits in the past. I would hold they cannot reject it now, and would affirm the trial court.

McGIVERIN, J., joins this dissent.